## ENGLISH *v.* NORTH.

## Opinion delivered April 20, 1914.

1. FRAUD—MISREPRESENTATIONS—RESCISSION OF CONTRACT.—Where the parties have deliberately entered into a written contract for the sale of property, a court of equity will not set the same aside, unless there be clear and satisfactory evidence to show that there was a misrepresentation by the defendant as to a material fact, that plaintiff relied upon it, and was induced thereby to make the contract. (Page 498.)

2. RESCISSION OF EXCHANGE OF LAND—REPRESENTATIONS AS TO VALUE.— When defendant's representations relate exclusively to the value of the land, there is no ground for the rescission of an exchange of property. Mere inadequacy of consideration, unaccompanied by circumstances showing fraud or imposition, is not sufficient to warrant the cancellation of an executed or executory contract. (Page 500.)

3. RESCISSION OF EXCHANGE OF LAND—FALSE REPRESENTATIONS—RELIEF. —Where plaintiff was induced by false statements and represen-

tations of defendant to enter into an agreement to exchange certain property, and the misrepresentations related to the character and value of defendant's land, and plaintiff acting upon the faith of defendant's statements, was injured by the exchange, a court of equity will order the deeds between the parties canceled. (Page 502.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

### STATEMENT BY THE COURT.

This suit was instituted by appellant against the appellees to rescind a trade involving an exchange of real property between appellant and appellees. The appellant alleged that he had conveyed a certain lot in the city of Little Rock to appellee, Mabel B. North, in consideration of a conveyance by her to appellant of a certain tract of land in Sharp County; that appellant had never seen the land conveyed to him by appellee, and that the land was represented by appellee Arthur North, who acted as agent for his wife, Mabel North, to be all tillable, productive bottom land except seven acres, and that it was situated on Spring River, had a mill on it, and that it was worth $15 per acre in cash, and $16 per acre by way of exchange. He stated that he had never seen the land at the time of the trade, and that he acted entirely upon North's representations. He alleged that the representations of North were false and fraudulent, and he tendered a deed, offering to reconvey the land to appellee Mabel North, and prayed that the sale and exchange be cancelled, and that appellees be required to execute a deed reconveying to him the lot which he had conveyed in exchange.

Appellees answered, denying the allegations of fraud, and alleging that North told appellant that the land had been estimated to him to be worth $15 per acre, and that appellant, through his agent, wrote to the Farmers Bank of Hardy, asking an opinion of the value of the land; that the bank gave the appellant an opinion, upon which appellant acted in making the exchange, and not upon any representations made by appellees. Appellees further

alleged that the land was worth as much as the lot which they obtained from appellant in exchange.

The testimony on behalf of the appellant tended to show that Arthur North advertised that he had a tract of land in Sharp County that he would trade for city property. He described the land to a real estate agent who had for sale certain property in the city of Little Rock owned by Peter English. North described the land to the agent as containing 125 acres, and that the larger part of it, something like 100 acres, would be good agricultural land. The rest of it could be put in fruit land, and there was a small tract in the corner that would not be of value for agricultural purposes. He stated that some thirty or forty acres had been in cultivation; that the timber on part of it had been cut off, and there was a strip of it that the timber had not been cut off. The part that had not been cleared had good tie timber and saw timber on it. Five acres was a mill site that had an old mill on it, a couple of houses and some sheds. There was lumber enough left to build such barns and sheds as a man might want and to do fencing around the house. Spring River ran across the corner of it, and cut off a small piece of the land. It was made land from the stream—not such river bottom land as we have here, but was not subject to overflow. **North said the land** was worth $15 an acre in cash.

The agent gave English the description of the property that had been given him by North and arranged to have North and English meet in order to effectuate an exchange of the city house and lot belonging to English for the land of North. English and North met in the office of Witherspoon & Chew, agents of English. North described the property in Sharp County to English as containing 125 acres of river bottom land; that Spring River cut off five acres. He drew a rough sketch of the land on paper and showed English how the land lay. There was about thirty-five acres of it cleared—the balance of it timber land, having all kinds of timber, such as oak, ash, hickory, walnut, etc., on it. He stated that the

timber on the land was worth more than what he was asking for the land; that there was a sawmill on the five acres and two or three other buildings; that the sawmill had been put up two or three years before for the purpose of sawing timber, but for some reason the mill had not been operated. The buildings were out of repair and fences down; that there was lumber enough left on the premises to repair all the buildings and repair the fences; that the thirty-five acres of cleared land had not been cultivated for a couple of years and had grown up in brush; that the land was all river bottom except about seven acres that was stony. The land was worth $15 an acre cash or $16 in trade. English said to North that "it was customary to see land or property before buying it, and asked him how he was going to see it." North said it was not necessary to go up there, and referred English to the Farmers Bank of Hardy, and stated that they could tell just what it was worth. English had Sutton, his agent, write to the bank concerning the land. The bank replied that the land was worth $15 or $16 an acre, but made no statement as to the character of the land. North's statements were the only source from which English got his information as to the character of the land. English thought Doctor North was telling him the truth, and relied on what North told him. Putting North's statements and the bank's statement together, English thought that it was all right, and on that account traded North his lot in the city for the land. He would not have traded on what the bank said alone. He wrote to the bank to find out whether the land was worth $15 an acre. He wanted land worth that much. If the land had not been worth $15 an acre, he would not have considered it all right, regardless of how the land was situated; but the statements of North, made as to the character of the land, "had a whole lot of influence" with English in causing him to make the trade.

English stated that while he and North were conducting negotiations looking to closing the deal in the office of Witherspoon & Chew, there was a difference

between them in regard to the insurance on the house which English was proposing to trade for the land. North wanted the insurance transferred to him, and English objected unless North would pay him for the unexpired part of it. Chew suggested that they settle the matter between them by North paying half of the unexpired part and English donating the balance. During the conversation about the insurance, English told North that he (English) would take the land on the representation that he (North) had made. He took it expecting to find it just as North represented it. English told North that he thought North was getting the best of the trade; that he (North) had seen what he was getting, but that he (English) had not seen what he was getting. In reply to that North referred English to the bank, stating that the bank would verify what had been said, and that English would find it just as he (North) represented it to be, The trade was then closed.

A month or so after that English visited the land. He found it exactly the reverse of what North had represented it. The land was rolling from the river to the top of the mountain, jumping from one precipice to another like steps or stairs of rock, except the five acres where the mill site was. There were two or three little old shacks on this site, not tenantable at all. Was nothing left of the sawmill except some part of the old machinery where the mill had been burned down. English did not find any timber land on it except around the five acres—no land such as he expected to find. The spot around where the mill stood, the five acres, could be tilled, but there was a good deal of rock there. The five acres didn't touch the river. The five acres where the mill stood was about 200 feet from the river. The timber was very poor, except occasionally, a long distance apart, a good sized tree could be found for sawing purposes if they could be gotten out, but there was no way to get at them. There was no accessible timber to justify the running of a sawmill.

The basis of the trade was that North was to give English the 125 acres for the house and lot on Twenty-second and Spring streets in Little Rock, and assume $1,000, the amount of a loan that English had obtained on the same. English valued his house and lot at $3,000. It was shown that the house and lot were worth from $1,900 to $3,000.

Witnesses on behalf of appellant, who were familiar with the land in Sharp County, testified that there were from twenty to forty-five acres of tillable land in the tract; from five to ten acres of creek bottom; the balance all hill land, rough and stony. The land was worth from $4 to $5 an acre. One witness, who formerly owned the land, and who had traded the same to another party, wrote appellant to the effect that in the trade he valued it at $1,300, but that he was offering the land for $600. The witness stated in the letter, "You see it will trade if you can trade without letting the other fellow see it, but there is no one that likes it when they see it." This witness offered, in his letter, to give English for the land a soda fountain and a note for $250, or he would give English "a bunch of Arizona horses—thirty-five head," and stated, "some of our fellows up here have done well trading in them."

It was shown on behalf of appellant by a surveyor who, at his instance, had examined the land, and who was familiar with farming lands, and who had had experience in judging the character and fitness of land for various uses, that there was practically no farm land on it on account of its being so excessively rocky and on a hillside; that all the timber of value, except for farm purposes, had been taken off years before; that there were probably five or ten acres, maybe a little more, in the northwest corner, that might be used as orchard, but under great difficulty. There was no land that witness would class as successful farming land outside of possibly five acres, and not over thirty-five acres of orchard land under the most favorable conditions. "The nearest that the land comes to the river," according to this wit-

ness, "is from a quarter to a half a mile. The Sharp County land in question is not fit for farming as a practicable proposition." Witness was employed by appellant's attorney to examine the ground, and was paid $5 per day and expenses. He familiarized himself with the whole 125 acres. It took him about two hours to go over it.

Another surveyor testified on behalf of appellees that it would have taken the surveyor who examined the land from eight to nine hours if there was much timber or brush.

Appellee, Arthur North, on behalf of appellees, testified in part as follows: "I described the land as rolling land and told him (English) that it was situated maybe a couple of miles south of the town of Hardy, and was on Spring River, and that the railroad ran across the corner of it or near the corner; that about half of it was considered in good timber, or fair timber. I told him from the description I had of the place it was about half in fair timber and good tie timber any way—something to that effect. I told him it was land we had recently bought, and that I had just been up and seen the place, and had spent a couple of hours on the place; I believe I might have said two or three hours; I don't know, but something to that effect. When I got the place, I had a little sketch made me, showing how the land lay, and I gave English a copy of the sketch, describing the land, telling him that was the way it had been described to me. I did not know land values in Sharp County. The proposition was made to my wife to buy it, and we got the information as to the worth of the land through the Citizens Investment Company, and then through the Farmers Bank of Hardy. I conveyed to Mr. English the way I found out what the value was, and he said, 'How will I find that value?' and I said, 'You can either go up there or you can do like I did—inquire through the bank.' He asked me what bank, and I told him the Farmers Bank, of Hardy, Arkansas. He turned to Mr. Sutton and said, 'I believe we will write up to these people,' and that

ended the proposition. I didn't know the man who gave English the information; never had any dealings with the bank except once I placed with it a note for collection amounting to $250, some time in December. Mr. English told me that when they heard from the bank they would call me up. I was living at Fourche Dam at the time. So we made an engagement for the next day to come in and bring the deeds along. I told English there had been a sawmill on the place at some previous time that had burned down. I didn't represent that there was a sawmill there on the land. I told him there was a big long shed that had been used by the mill for putting horses in, and there was quite a lot of lumber in it, and that from one end of that shed he could get enough lumber to fence in the house and make such repairs as was needed on the houses. I told him it was rolling land, and that I supposed maybe three-fourths of it, maybe eighty or eighty-five acres of it, could be put in cotton and corn, and that seven or eight acres, may be possibly ten acres, of it would not be fit for anything unless he used it for a pasture; that the other land would make good fruit land. I described it to him as I had received my information through the bank and from my two hours' sight that I had of the place when I went up there. I distinctly told him that it was upland, farm land, and that it had shale all the way through it, and that about thirty acres had been in cultivation about three years before, and that it had been neglected and had grown up again. I didn't say anything to Mr English that would give him to understand that the land was all tillable land. I distinctly told him that there were several acres, seven or eight, possibly ten acres, in one corner that stood up like a ledge nearly on one side. I advertised the place for $15 an acre for trade in the paper, and as such Mr. Sutton answered the advertisement, and I told Mr. English how I got the figures that the land was worth $15 an acre. I certainly did not tell Mr. English that it was hardly necessary for him to go up there to look at the land, for I advised him to either see the land or get outside infor-

mation on it. In view of that fact, he either wrote there or got his agent to write. I put it squarely up to him to either see the land or take the action through the bank, which he did, and he waited five or six days before he told me he would take the place. He didn't close the deal until after he wrote to the bank himself, through his agent.''

Another witness on behalf of appellees testified that he was at one time the owner of the 125 acres of land in question and sold it for $1,250. He estimated the land to be worth $15 per acre. He had been offered $7.50 an acre for it by one who lived near the property. At least half of the land was in fairly good timber, consisting of white oak, post oak, red oak, hickory, ash and walnut. Witness paid $1,300 for the land when he bought it.

The cashier of the bank testified that he gave as his opinion, from information he had received from a man who lived adjoining the land, that it was worth $15 per acre; that the bank had no lien on, or any interest in, any way in the land.

From a decree in favor of the appellees, based upon the above facts, this appeal has been duly prosecuted.

*Moore, Smith & Moore,* for appellant.

1. The trade should be rescinded and the deeds cancelled for the false and fraudulent misrepresentations of North, upon which appellant relied and was thereby induced to make the trade to his injury. 11 Ark. 58; 33 *Id.* 425; 71 *Id.* 99; 99 *Id.* 442; 132 N. W. 728.

2. The fact that appellant did not rely *solely* on North's representations and sought outside information as to value did not deprive him of the right of rescission, provided he did rely upon those statemenst, and was materially induced by them to make the trade. 99 Ark. 442; 71 *Id.* 91; 97 *Id.* 628; 89 *Id.* 321; 96 *Id.* 321; 132 N. W. 727; 30 Ark. 362; 43 *Id.* 454-652; 56 Fed. 139; 115 N. W. 15; 35 Atl. 884; 2 Pom., Eq. Jur., § 895.

*Ben D. Brickhouse,* for appellee.

1. In 47 Ark. 148, cited in 101 Ark. 608, four tests are laid down to entitle one to the relief prayed in this cause:

(a) Was the fraud material, and did it relate to some matter of inducement to the making of the contract?

(b) Did it work. an injury?

(c) Was the relative position of the parties such, and their means of information such, that the one must necessarily be presumed to contract upon the faith reposed in the statements of the other?

(d) Did the injured party rely upon the fraudulent statements, and did he have a right to so rely in full belief of their truth? Reviews the evidence and contends that the tests are not met and that the doctrine of *caveat emptor* applies, citing 11 Ark. 67; 43 *Id.* 454; 19 *Id.* 528; 47 *Id.* 164; 95 *Id.* 378; 101 *Id.* 608; 82 *Id.* 23; 83 *Id.* 413.

WOOD, J., (after stating the facts). In *Kincaid* v. *Price,* 82 Ark. 20-24, we said: "To justify a court of equity in rescinding and cancelling a written contract for the conveyance of land on the ground of misrepresentation, a clear case should be made out by the evidence. Where the parties have deliberately entered into a written contract for the sale of property, it ought not to be set aside by a court unless there be clear and satisfactory evidence to show that there was a misrepresentation by the defendant as to a material fact, that plaintiff relied upon it, and was induced thereby to make the contract."

As early as *Yeates et al.* v. *Pryor,* 11 Ark. 66, this court announced the following rule: "The misrepresentation, in order to affect the validity of the contract, must relate to some matter of inducement to the making of the contract, in which, from the relative position of the parties and their means of information, the one must necessarily be presumed to contract upon the faith and trust which he reposes in the representations of the other on account of his superior information and knowledge in regard to the subject of the contract; for if the means of information are alike accessible to both, so that, with

ordinary prudence or vigilance, the parties might respectively rely upon their own judgment, they must be presumed to have done so; or if they have not so informed themselves, must abide the consequences of their own inattention and carelessness. Such representations, therefore, to amount to fraud, must be of a decided and reliable character, holding out inducements, to make the contract, calculated to mislead the purchaser and induce him to buy on the faith and confidence of such representations, and in the absence of the means of information to be derived from his own observation and inspection, and from which he could draw conclusions to guide him in making the contract **independent of the representations** of the vendor.''

These principles have been often recognized by this court. See *Hill* v. *Bush*, 19 Ark. 528; *Matlock* v. *Reppy*, 47 Ark. 164; *Neely* v. *Rembert*, 71 Ark. 91; *Ryan* v. *Batchelor*, 95 Ark. 375; *Carwell* v. *Dennis*, 101 Ark. 608.

In *Matlock* v. *Reppy, supra,* the court prescribed four tests to determine whether the rescission of contracts upon the ground of fraudulent representations could be maintained, as follows:

''(a)   Was the fraud material to the contract; did it relate to some matter of inducement to the making of the contract?

''(b)   Did it work an injury?

''(c)   Was the relative position of the parties such, and their means of information such, that the one must necessarily be presumed to contract upon the faith reposed in the statements of the other?

''(d)   Did the injured party rely upon the fraudulent statements of the other, and did he have a right to rely upon them?''

There can be no misapprehension, therefore, of the law governing cases of this kind. The difficulty always is in making application of the principles to the facts in hand. Each case must depend, of course, upon its own peculiar facts.

Applying the principles above announced to the facts in this record, we are of the opinion that the chancellor erred in denying the appellant the relief sought.

If the representations of North had related exclusively to the value of the land, they would have afforded no ground for rescission of the sale or exchange of property between the appellant and appellees; for representations as to value are generally matters of opinion about which there might be a divergence of views, and mere inadequacy of consideration, unaccompanied by circumstances showing fraud or imposition, is not sufficient to warrant the cancellation of an executed or executory contract. *Storthz* v. *Williams,* 86 Ark. 464. But appellee, Arthur North, in addition to the representation as to the value of the land, made further representations as to the nature and character of the land, giving such a detailed statement of facts concerning same as to justify appellant in relying upon the truth thereof. While appellant would have been satisfied in acquiring land in the trade that was of the value of $15 per acre, appellee North stated facts which were calculated to induce appellant to believe that the land in Sharp County was of the value that North had represented it to be.

The evidence shows clearly that North represented that at least the larger part of the land—all except a few acres, not exceeding ten—was agricultural or tillable land. Appellee Arthur North himself testified that he told English that "maybe eighty or eighty-five acres of it could be put in cotton and corn, and that seven or eight acres, possibly ten acres, would not be fit for anything unless he used it for a pasture; that the other land would make good fruit land."

This testimony of appellee Arthur North shows that he represented that all of the land except possibly ten acres was susceptible of cultivation in some form, either for agricultural products or fruit, whereas the great preponderance of the evidence shows that not more than forty-five acres, according to the highest estimate of any witness, was tillable land. It therefore satisfactorily ap-

pears by a clear preponderance of the evidence that North's representations as to the character of the land for cultivation were untrue. This was a very material fact in determining its value, and if his representations as to the character of the land for agricultural and fruit purposes had been true, this would have constituted a fact tending strongly to show that his representation as to the value of the land was also true.

English told North before the negotiations were closed that he would take the land on the representations that he (North) had made. The representations North had made as to the character of the land had "a whole lot of influence" with him in causing him to make the trade. When the bank replied to his letter of inquiry as to the value that the land was worth $15 an acre, he took that statement, together with North's statement, as showing that the land was worth that much, and on that account traded. North had special information in regard to the character of the land in Sharp County, acquired by personal observation of it, that English did not have. English reminded him of this, and North replied that English,. upon inquiry of the bank at Hardy, would find it just as he (North) had represented it to be.

The proof clearly warrants the conculsion that appellant English did rely upon the representations of North, and that he had the right to rely upon them in the belief of their truth. It is clear that, while English sought information from the bank as to the value of the land, he would not have made the trade upon this information from the bank as to the value of the land if it had not been for the representations of North concerning the situation and character of the land.

In *Winter* v. *Bandel et al.*, 30 Ark. 363-373, we said: "If, however, the plaintiff mainly and substantially relied upon the fraudulent representation, he will have his action for the actual damage he sustains, although he was in part influenced by other causes." *Carvill* v. *Jacks,* 43 Ark. 454.

Suppose North had stated that the land was of the value of $15 per acre, but that only ten acres of it was susceptible of cultivation, and that it was stony and rocky ground, having scarcely any timber thereon, and not suitable for agricultural purposes? In such case, can it be doubted that English would have refused to make the trade, even though North represented that its value was $15 per acre, and even though the bank corroborated such statement? Stating the proposition in this form shows clearly that English relied upon the representations of fact made by North as to the character of the land. When English advised North that he was relying upon his representations, North was bound to make correct and truthful statements, for he and English were not placed in the same relative situation in regard to the property. Their means of information as to the particular description of the land was not the same. In *Neeley* v. *Rembert, supra,* we said: "A vendor who makes a false statement regarding a fact material to the sale, either with knowledge of its falsity, or in ignorance of its falsity, when from his special means of information he ought to have known it, and thereby induces his vendee to purchase, to his damage, is liable, in an action at law, for the damage the purchaser sustains through the misrepresentation, or to have the sale rescinded in a suit in equity, at the option of the purchaser."

A clear preponderance of the evidence shows that English was injured by reason of the exchange of properties. Therefore, under the facts, he has met every test which the law requires to entitle him to a rescission. The decree of the court will therefore be reversed and the cause remanded with directions to cancel the deed from English to North, and from the Norths to English, and for such other proceedings as may be necessary not inconsistent with this opinion.