LOVELESS *v.* DAVIS.

Opinion delivered January 25, 1915.

1. CONTRACTS—EXCHANGE OF LANDS—MISREPRESENTATIONS—RESCISSION. —In order to vitiate a trade or exchange of lands, on the ground of fraudulent misrepresentations, the misrepresentations must relate to a matter material to the contract and in regard to which the other party had a right to rely, and did rely to his injury.

2. CONTRACTS—MISREPRESENTATIONS—RESCISSION.—In an action to rescind a contract for the exchange of land, on the ground of fraudulent misrepresentations made by the defendant, if the means of information as to the matters represented are equally accessible to both parties, they will be presumed to have informed themselves, and if they have not done so they must suffer the consequences of their own neglect.

3. EVIDENCE—EXCHANGE OF LANDS—MISREPRESENTATIONS BY ONE PARTY —RESCISSION.—In an action to rescind a trade of real estate, testimony by a third party as to the statements made to him by defendant with reference to the character of the land, after the trade between plaintiff and defendant was closed, is admissible and competent as tending to discredit the testimony given by defendant on the trial of the case.

4. CONTRACTS—RESCISSION—EXCHANGE OF LAND—MISREPRESENTATIONS.— A trade of land between plaintiff and defendant will be rescinded where defendant, although he had never seen the land he was trading to plaintiff, and so informed the plaintiff, misrepresented the character of the land for cultivation, and its situation with reference to a well, a town and a railroad, and where the plaintiff relied on these statements in making the purchase, and although defendant offered to pay one-half of plaintiff's expenses if he would visit and inspect the land.

Appeal from Sebastian Chancery Court, Fort Smith District; *W. A. Falconer,* Chancellor; reversed.

STATEMENT BY THE COURT.

J. N. Loveless instituted this action in the chancery court against C. A. Davis and his wife to rescind a contract for the exchange of lands between them on account

of the alleged false representations made by the defendants to the plaintiff.

The record is very voluminous, the witnesses being examined and cross-examined at great length, and after a careful examination of the record we think the substance of the testimony is as follows:

On the 27th day of February, 1912, the plaintiff, J. N. Loveless, conveyed by warranty deed to the defendant, C. A. Davis, certain residence property in the city of Fort Smith, Arkansas, and in exchange therefor Davis conveyed to Loveless a section of land in Craine County, Texas. Loveless and Davis at the time were residents of the city of Fort Smith and had been for several months but did not become acquainted with each other until they began to negotiate for the exchange of these lands. Davis had moved there from Polytechnic, Texas, on account of the ill health of his wife. He owned a residence at that place and exchanged it to W. S. Essex for the section of land in Craine County, Texas. Neither of the parties had seen the land but traded upon the representations made to them by A. P. Nelms, a preacher, who had formerly lived in Craine County, near the land. At the time the exchange was made Essex owned four sections of land in a body, upon which there was a vendor's lien for $4,000, but there was an understanding that each section should be free from the lien upon the payment of $1,000. When Davis moved to Fort Smith he concluded to exchange his Texas property for residental property in Fort Smith and in order to affect that purpose went to certain real estate agents in Fort Smith. He finally became acquainted with R. S. Grigsby and C. A. Smith who undertook to sell or exchange the lands for him. He told them that he had never seen the land but that he had purchased it upon the representations of a preacher named A. P. Nelms, in whom he had great confidence. He told them there was a lien for $1,000 against the land; that a railroad ran through Craine County and that this land was close to the railroad, or, as a matter of fact, that the railroad cut off about three acres of the land; that there were

stock pens upon the railroad and on this land; that the nearest station to the land was the town of Metz, a flourishing town of 800 or 1,000 people; that there was a flowing well of water near the partition fence between this and an adjoining section; that the land was fenced with three strands of wire and cross-wired up to this partition well with posts made of new bois d'arc; that some of the land had been planted in onions and that he had been offered $12.50 an acre for it and had been advised not to take that sum because he could sell it for more by placing it on the market with other adjoining sections; and that the land was good, black, sandy land.

Grigsby testified to substantially the same state of facts, and both Grigsby and Smith stated that they had made these representations to Loveless at the instance of Davis, and that Davis subsequently made the same representations to Loveless; that he stated to them and to Loveless that he had never been on the land and made these representations as being told him by A. P. Nelms, who had been his agent when he exchanged his Texas property for the land, and that he had great confidence in him.

Before the trade was consummated Davis offered to pay one-half of the expenses of Loveless in going to Texas to examine the land. The land was about 800 miles from Fort Smith and the ticket and return would have cost something over $27.

The plaintiff Loveless testified that Davis told him there was a railroad running through the land cutting off about three acres of the northwest corner; that there was a six strand fence on the land; that there was a flowing well of water on the land near the southern line; that it was good agricultural land; that a part of it had been planted in onions; that it would rent for $3 an acre; that he had passed over the land on the railroad but did not stop off to examine it; that there were stock pens on the land and that the town of Metz was just across and beyond the stock pens and had from 800 to 1,500 inhabitants; that he had been offered $12.50 for the land and had refused to sell at that price; and that he relied

upon these representations made by Davis and for that reason did not accept his proposition to go down there to inspect the land.

After the exchange of the land had taken place Loveless went to Texas to examine the land. He testified that there was no flowing well of water on the land or near it; that there was a small well of water on the land adjoining but that it was several miles away; that the land was only enclosed by a cattle fence of three wires; that none of it had ever been put in cultivation and that it was entirely unfit for cultivation; and that it was only fit for grazing purposes.

Other witnesses who resided in Craine County testified that that county had only about two hundred inhabitants; that the land in question was only fit for grazing purposes and that its rental value for that purpose was only about ten cents per acre; that it was only worth about two dollars an acre; that it was unfit for cultivation; that there was no well on the land or near it; that the nearest water was a small well several miles away; that there were no stock pens on the land; that the town of Metz was eight or ten miles away and contained only about nineteen inhabitants and that most of these were Mexicans; that there were stock pens on the railroad at Metz, and also at another little station which was about the same distance from the land, or perhaps a little nearer; that in their opinion no water could be found on the land, or, as one of the witnesses expressed it, "you might as well climb as dig for water;" that the whole county is a dry, arid place, and wholly unfit for cultivation.

After the exchange of lands had been made between Davis and Loveless, Grigsby and Smith attempted to sell the land to one Harris, and Davis endeavored to assist them.

A Mr. Cannington, another real estate agent, represented Harris. He testified that Davis drew up a little plat of the land showing that there was a flowing well of water on the partition line between it and the adjoining section; that the town of Metz was located at the

corner of the section; that he represented that half of the land had been planted in onions; that he had been offered $12.50 an acre for it and refused it; that there was a switch on the land adjoining it and stock pens upon it; and that the land was fenced with a six wire fence and cross fences.

Davis testified that all the representations made by him as to the land were made from the information he had received from A. P. Nelms, a preacher, in whom he had great confidence; and that he expressly stated to Loveless, Grigsby and Smith that he had never been on the land and that the representations he made were those which had been made to him by Nelms.

He testified that the land was fenced on three sides with three strands of wire and joined a ranch on the west side which was fenced with wire; that the fence had heavy bois d'arc posts; that there was a well of water and some improvements on the adjoining section just over the line; and that the land was six or seven miles southwest of the little town of Metz.

He denied that he told them that there were stock pens and a railroad switch on the land or immediately adjoining thereto; and stated that he told them the stock pens and switch were at the town of Metz. He stated that Judge Essex, with whom he had exchanged his Texas property for the section, advised him not to take $12.50 per acre for the land and to hold it and let him sell it with his other land because thereby he could secure a higher price. He denied that he told him that any of the land had been cultivated.

A. P. Nelms testified that he had formerly lived in Craine County, Texas, and knew all about the land; that a large portion of the land was tillable and was very good soil consisting of sandy loam; that formerly it was thought that these lands were not productive, but that it was adapted to raising certain kinds of grain and fruit; that he told these facts to Davis and also told him about the fences and the well on the other section; that there was a vendor's lien of $4,000 on the four sections and that the holder of the lien had agreed to release the lien

as to the section in question upon the payment of $1,000.

Other testimony will be stated or referred to in the opinion. The chancellor found in favor of the defendant and the plaintiff has appealed.

*P. E. Rowe* and *Robert A. Rowe,* for appellant.

From the testimony, this case falls clearly within the rule authorizing a rescission where the fraudulent representations were made by one who either knew them to be false, or else, not knowing, asserted them to be true with intent to have the other party to act upon them to his injury. 101 Ark. 95. Fraud avoids a contract *ab initio.* 35 Ark. 483; 11 Ark. 58.

Where one in possession of land, professing to be familiar with its quality, by false representations induces another to contract in reference to it, he is liable for the deceit, whether he knew the representations to be false or not. 30 Ark. 535; 38 Ark. 334. See, also, 25 Ark. 41; 30 Ark. 362; 60 Ark. 387; 43 Ark. 454; 47 Ark. 148; 46 Ark. 125; 26 Ark. 604.

*Winchester & Martin,* for appellee.

In order to affect the validity of a contract, the misrepresentation must relate to some matter of inducement in which, from the relative position of the parties and their means of information, the one must necessarily be presumed to contract upon the faith and trust which he reposes in the representations of the other; and if the means of information are alike accessible to both, so that by ordinary prudence and diligence each party might rely upon his own judgment, he will be presumed to have done so. Failing therein he will be held to abide by the result of his own inattention and carelessness. 19 Ark. 522; 101 Ark. 603.

HART, J., (after stating the facts). The law in this case is well stated in *English* v. *North,* 112 Ark. 489, 166 S. W. 577. In that case the court held:

1. "Misrepresentations which will justify the rescission of a contract for the sale of land must be of a decided and reliable character relating to some matter of inducement to the making of the contract calculated to

mislead the purchaser and induce him to buy on the faith
and confidence thereof, and in the absence of means of
information to be derived from his own observation and
inspection, and must injure the party seeking to rescind.''

4. ''Where one who exchanged 125 acres of land for
city property, not only misrepresented its value, but also
represented that all except possibly ten acres was sus-
ceptible of cultivation in some form, when in fact not
more than forty-five acres was tillable, though he had
special information regarding the character of the land
acquired by personal observation, and was told by the
other party that he would take the land in reliance on
such representations, and it appeared that the other
party was injured by the exchange, a rescission would
be decreed.''

(1) So it may be taken as well settled in this State
that in order to vitiate a trade on the ground of fraudu-
lent misrepresentation, the misrepresentation must re-
late to a matter material to the contract and in regard
to which the other party had a right to rely and did rely
to his injury.

(2) It is also the law that if the means of infor-
mation as to the matters represented is equally accessible
to both parties they will be presumed to have informed
themselves, and if they have not done so they must suffer
the consequences of their own neglect.

The chancellor was of the opinion that a clear pre-
ponderance of the evidence showed that the defendant
urged the plaintiff to visit the Texas land before the
deeds had been exchanged and offered to pay half of the
expenses of the trip. It was also the opinion of the
chancellor that the plaintiff refused to go, but made an
independent investigation of his own as to the value of
the lands and as to their character.

We do not agree with the chancellor in this finding.
It is true the defendant offered to pay half of the ex-
penses of the plaintiff in order that he might go and look
at the land himself before the trade was made. It is
also true that the plaintiff did make inquiry of another

person who resided in Texas concerning the land, but this person did not live in the immediate vicinity of the land and only told the plaintiff that as a general proposition western lands were rising in value. The plaintiff stated that he did not accept the proposition of the defendant to go and examine the lands before he made the exchange for them because he relied upon the representations made to him by the defendant, and we are of the opinion that he had a right to rely upon these representations.

The defendant told him that he had never been on the lands and that the representations he made in regard to them were derived from Nelms, but Nelms was his agent when he exchanged his Texas land for them.

The preponderance of the evidence shows that the defendant represented to the plaintiff that the lands were of black sandy loam, and that part of them had been cultivated in onions; that the land was adapted to the cultivation of certain kinds of grain and fruits; also that there was a flowing well of water on the tract of land adjoining and that this well was situated near the partition line between this land and the adjoining section; that the lands were situated near Metz; that Metz was a thriving village of eight hundred people; and that there were stock pens and facilities for handling stock on the land.

The preponderance of the evidence shows that these representations were not true; that the town of Metz was situated at least eight miles away and that only nineteen people lived there, most of them Mexicans; that there were no stock pens or switches on the railroad nearer than the town of Metz; that there was no flowing well of water on the land, the nearest water being a small well on the section adjoining, several miles away from the partition fence; that one-half of the land was gyp, which was wholly unsuitable for raising any kind of crops, and that the other half was sand and crops of no kind could be raised on it.

The representations that the land could be rented for three dollars an acre was not true; it could only be

rented as pasture land and the rental value was only ten cents per acre.

Nelms, the preacher who represented the defendant when the exchange was made for the Texas land, testified that he told them there was a small well on the land adjoining but as we have already seen this well instead of being near the partition fence was several miles away and instead of being a flowing well was only a small well with a wind mill attached to it. Nelms also said that the land was a black sandy loam and was capable of raising good crops of different kinds of grain and fruit but the testimony of several other parties who resided in Craine County showed that there were only about two hundred people in the county; that the soil was entirely worthless for agricultural purposes and that no water could be procured on it by digging wells.

(3) Cannington, who tried to purchase the lands for Harris after the exchange in question was made, testified that Davis told him that the lands were situated right on the railroad; that Metz was a flourishing town of a thousand inhabitants; and that stock pens were situated on the railroad right next to the land. Though these statements of Cannington were made after the exchange had been made, the testimony was competent as tending to discredit the testimony given by Davis on the trial of the case.

(4) It will be remembered that Davis stated that he merely told Loveless what had been represented to him by his agent Nelms. Nelms testified as to what he had told Davis and under this testimony the plaintiff might well have believed that the land was susceptible to cultivation and was well worth the land which he exchanged for it.

These representations the plaintiff relied upon, and had a right to rely upon, and the preponderance of the evidence shows that the representations were not true. All of the witnesses who lived near the land testified that it was a dry, arid place, unfit for cultivation, with no water on it and none near it.

Under these circumstances we do not think it is a case for the application of the rule that where the means of information are alike accessible to both parties they must be presumed to have acted upon their own information and not to have relied upon the information given them by the other.

It follows that the judgment must be reversed and the cause remanded with directions to enter a decree in favor of the plaintiff in accordance with the prayer of his complaint.