FEGAN v. ANDERSON.

Opinion delivered April 9, 1917.

1. EXCHANGE OF LAND—FALSE REPRESENTATIONS—RESCISSION.—The evidence held sufficient to show that defendant, who had exchanged lands with plaintiff, had made false representations to the latter, and that plaintiff had relied thereon.

2. EXCHANGE OF LANDS—FALSE REPRESENTATIONS.—Where defendant made false representations as to the value of his property, which he exchanged with the plaintiff, he will not be heard to say that the plaintiff should not have relied thereon, but should have made an independent investigation.

3. EXCHANGE OF LANDS—FRAUD.—In a contract to exchange lands, the evidence *held* to show defendant guilty of fraud in dealing with plaintiff's deed to him in having it prematurely recorded.

4. EXCHANGE OF LAND—LAND IN ANOTHER STATE—JURISDICTION OF EQUITY.—Defendant, on an agreement to exchange lands, fraudulently obtained a deed to himself of plaintiff's lands in another State. *Held*, the chancery court could compel him to reconvey, or to restore the deed wrongfully appropriated.

Appeal from Washington Chancery Court; *T. H. Humphreys*, Chancellor; affirmed.

*John Mayes*, for appellants.

1. The findings of the chancellor are persuasive merely. Here they are clearly against the preponderance of the testimony. Fraud is never presumed, but must be proven by clear and convincing testimony. No fraud, misrepresentations or deceit were proven. 11 Ark. 66; 19 *Id*. 528; 47 *Id*. 164; 71 *Id*. 91; 95 *Id*. 375; 101 *Id*. 608; 112 *Id*. 499; 116 *Id*. 443.

2. The testimony shows that the deeds were actually delivered and the trade completed. The deeds were good, if not acknowledged. 30 Ark. 111.

3. Failure to stamp does not render a deed or note void. They could be properly stamped afterward. 26 Ark. 398.

4. Edmiston was appellees' agent.

*Walker & Walker,* for appellees.

1. The transaction was properly rescinded for fraud, misrepresentations and deceit. 112 Ark. 489; 71 *Id.* 91; 116 *Id.* 448; 120 *Id.* 330. The findings of the chancellor are sustained by the evidence. *Supra;* 70 Ark. 385; 91 *Id.* 69; 84 *Id.* 429; 95 *Id.* 523. Here there was oral testimony.

McCulloch, C. J.   Appellees owned a farm in Matagorda County, Texas, containing 149.10 acres of the value of about $8,000, and on June 29, 1916, they entered into an agreement with appellants to exchange said farm for two tracts of land in Washington County, Arkansas, containing in the aggregate 558 acres, then owned by appellants. Deeds were exchanged between the parties conveying to each the respective lands to be received. The contention of appellees is that the deeds were not delivered in consummation of the agreement, but merely to be held by each party for the inspection of their respective attorneys and until abstracts of title could be furnished; that appellants, by willful misrepresentations concerning the location and character of lands to be conveyed, deceived them and thereby fraudulently induced them to enter into the bargain, and that as soon as they discovered the fraud they offered to return to appellants the deed executed for the Washington County lands and demanded the surrender of the deed executed by appellees to the Texas lands.

This action was instituted by appellees in the chancery court of Washington County on July 5, 1916, to compel appellants to accept a surrender of the deed to the Washington County lands and to restore to appellees the deed executed by them to the Texas lands, or to require appellants to execute to appellees a deed reconvey-

ing the Texas lands. Appellants contend, and so allege in their answer, that there was no fraud or misrepresentation practiced by them on appellees; that the bargain was entered into and consummated by them in good faith, and without any misrepresentations concerning the land, and that the deeds were not, as alleged in the complaint, merely handed over to be held until the abstracts of title should be completed, but were delivered in consummation of the bargain. The chancellor on the final hearing of the cause decided in favor of appellees and rendered a decree requiring appellants to execute to appellees a deed reconveying the Texas lands.

It is seen from the above recital of facts that this suit was commenced with unusual promptness after the alleged cause of action arose, and that it was heard in the chancery court and decided without delay. The chancellor heard the testimony of the witnesses, delivered orally at the bar, and reached the conclusion that gross fraud had been perpetrated and granted appropriate relief. The question presented for us is whether or not the finding of the chancellor is against the preponderance of the evidence.

Appellees, A. L. Anderson and wife, resided in Texas, where their farm was situated, but sought a new home on account of the ill health of the wife. Through the suggestion of some one, Anderson went to Washington County, Arkansas, to find a home, and was directed to a man in the town of Prairie Grove, in that county, who was engaged in the real estate business, and who it appears had the lands of appellants listed for sale. Those lands consisted of a farm containing 198 acres a few miles distant from Prairie Grove, and a tract of wild land containing 360 acres situated about fifteen miles from Prairie Grove. Anderson left his wife at Benton, Arkansas, and visited Washington County alone without having any acquaintances there. Appellants, Fegan and wife, resided at Prairie Grove, and the negotiations were conducted by Fegan through a real estate

agent, Edmiston, the man to whom Anderson was di-
rected. Anderson was turned over to Edmiston and was
taken out to see the 198-acre tract, which he found to be
satisfactory, but he did not see the other tract. He tes-
tified that Edmiston stated to him that the other tract
contained 100 acres of good tillable land lying in the
valley, and was covered with good merchantable saw
timber, the timber being reasonably worth $12 an acre
and could be readily sold for $7 per acre—that an offer
of $5 per acre had been made for it. He testified also
that Fegan told him that the 360-acre tract was covered
with good timber—that part of the timber consisted of
large trees which might be a little worm-eaten, but that
there was plenty of good merchantable timber on the land.
This occurred during the early part of June, somewhere
between the 5th and 9th of that month, and a tentative
agreement was entered into for the exchange of the prop-
erties, conditioned upon Fegan becoming satisfied after
making inquiry concerning the Texas land owned by the
Andersons. Anderson testified that he entered into this
agreement without going to see the 360-acre tract in re-
liance upon the representations made to him by Edmis-
ton and Fegan. Proceedings were suspended until Fe-
gan could inquire about the Texas lands, and Anderson
went back to Benton, Arkansas, to rejoin his wife.
There was correspondence between Edmiston and An-
derson, in which Anderson appeared anxious to make
the trade and Edmiston urged him to hurry up, and to
do so for the reason that, as he stated, the oil men were
seeking leases on the 198-acre tract and that sawmill
men were seeking to buy the timber on the 360-acre tract,
and that Fegan might back out of the trade; that being
thus urged, Anderson wrote to Edmiston to close the
trade and that he would forward his deed to a bank at
Prairie Grove to be held until he got there. The Ander-
sons went to Prairie Grove, reaching there on June 29,
and Fegan, having satisfied himself about the Texas
land, agreed to proceed with the bargain. They went to

the office of an attorney in Prairie Grove, who prepared the deeds, and the Andersons executed the deed to the Texas land and handed it over to Fegan, but they testify that the execution of the deed was not acknowledged and that the deed was not delivered in consummation of the bargain, but to be held until each party could have the deeds examined by their respective attorneys, and abstracts of title could be furnished. The Andersons both testified that on this occasion the aforesaid misrepresentations concerning the character of the 360-acre tract were renewed by both Edmiston and Fegan, who assured them that the land contained about 100 acres of good tillable land and was covered with valuable merchantable timber. After the deeds were passed the suggestion was made to the Andersons by a man in Prairie Grove, to whom the prospective trade was mentioned, that they had better make a trip out to see the 360-acre tract, for it was thought to be of little or no value. After the Andersons reached Prairie Grove they made a trip out to see the 198-acre tract and were satisfied with that, but they had not seen the other tract. As soon as this suggestion was made to them, however, they drove out to see the land. This was on June 29, the same day on which the deeds were exchanged. They found the tract of land to be worthless, that it contained practically no tillable land at all, and that all of the merchantable timber had been removed. The testimony shows conclusively that the tract of land had no timber on it of any value and that the tract of land itself was of very little value, containing scarcely any tillable land. It is shown to be exceedingly rough and hilly or mountainous. In fact, appellants do not attempt to show that this land had any substantial value, but their contention is that there were no misrepresentations, but that this tract was merely thrown into the bargain, the principal element of the trade being the 198-acre tract. As soon as the Andersons returned from inspecting the land they went to Fegan's office and informed him that they had ascer-

tained the truth about the condition of his land and offered to surrender the deed thereto and demanded 'a surrender of their own deed to the Texas land. This was the next morning after the execution of the deed, and Fegan informed them that he had already forwarded the deed to Texas to be recorded and refused to comply with the request of the Andersons, or to accept the surrender of the deed to the Arkansas lands. The Andersons then employed attorneys, and this litigation followed a few days thereafter.

Appellants deny that there were any misrepresentations, and they offer testimony which tends to support their contention. Edmiston and Fegan both deny that they made any representations at all concerning the character of the land, except as to the 198-acre tract which the Andersons examined for themselves. Edmiston testified that he introduced Anderson to Fegan for the purpose of bringing about the exchange of 198-acre tract, which was known as the Jones land, and that after Anderson and Fegan had conversed about the matter off to themselves Anderson returned greatly pleased and said that he and Fegan had about "fixed it" and that he (Anderson) wanted to go and see the Jones tract the next morning. He testified that he did not know at the time that the 360-acre tract was to be considered in the bargain, but that after they had returned from inspecting the other tract Anderson said something about the 360-acre tract, and he merely replied that he did not know that that place was to be in the bargain, stating to Anderson at the time that "if you get that place you are that much ahead." He testified that after they went back to Fegan's office he remarked to Fegan in the presence of Anderson and Hale, the attorney, that he had told Anderson "that it was a devil of a rough proposition." He testified that he said this to Anderson: "You will have to go through this man's field; that you will have to go down a terrible mountain; you will think you are going down to China when you get there; you will

have to go down this way a while and down that a while; there is a little two-room house, barn and a good garden spot, then you turn back to the small place.''

Fegan denied that he made any representations at all to Anderson concerning the large tract. He said that he had recently purchased the land and had never seen it. He and the attorney both testified that Anderson stated that ''he guessed it would make a good goat ranch and asked if it would be good to raise goats on.''

There is a very sharp conflict in the testimony so far as the number of witnesses is concerned, but there are many circumstances which strongly corroborate appellees in their narrative of the facts. The written correspondence between Edmiston and Anderson affords strong corroboration of the latter's testimony. Edmiston was urging him to close the trade and gave no reason for it except that oil men were trying to lease the 198-acre tract and sawmill men were trying to buy the timber on the larger tract—a statement which finds very little support in the record. In fact, the very conclusive proof that there was no merchantable timber at all on the large tract absolutely refutes the statement that there was any one trying to purchase the timber on the land. Appellants contend that Anderson was anxious to exchange his Texas land for the 198-acre tract and gladly went into the bargain merely for that tract without placing any substantial value on the larger tract, all of which is denied by Anderson, and the proof shows that just as soon as he received the suggestion from a responsible party that this land was probably of no value he hurried out to look at it, and when he found out the true situation he went to Fegan and demanded a rescission. It is not contended that the suggestion was made to Anderson by the man at Prairie Grove with any desire to interfere with the trade, and the circumstances give no color to the claim that the Andersons merely changed their minds and used this as a pretext to rescind the bargain. They acted very promptly, not only in go-

ing out to inspect the land and demanding a return of the deed, but also in instituting this action to get relief from the fraud which they say has been practiced upon them. Their promptness is undoubtedly a strong circumstance in support of their contention that misrepresentations were made to them concerning the value of the land, and that they relied upon those representations, and would not have entered into the bargain if they had not accepted the representations as the truth. It is true that appellees could have visited the land before they entered into the bargain, but they were, according to the testimony, induced not to do so on account of the fraudulent representations made to them concerning the character of the lands and the quantity of timber thereon.

(1-2) We think the evidence clearly establishes the fact that those misrepresentations were made and relied on and it does not lie in the mouths of appellants to say that appellees should not have relied upon the statement, but should have looked to satisfy themselves concerning the truth of the representations. *Neely* v. *Rembert,* 71 Ark. 91; *English* v. *North,* 112 Ark. 489.

(3-4) The evidence also supports the contention of appellees that the deeds were not finally delivered but that appellants, wrongfully and in violation of the agreement, hurried off the deed to Texas without furnishing abstract to the Arkansas land. The chancery court of Washington County had no jurisdiction to adjudicate the title to the Texas land, but it had jurisdiction over the appellants themselves with power to require restitution of the deed wrongfully misappropriated, or to require the execution of a reconveyance to appellees as evidence of their title. *Pillow* v. *King,* 55 Ark. 633; *King* v. *Pillow,* 6 Pickle (Tenn.) 287; *Carpenter* v. *Strange,* 141 U. S. 105.

The decree of the chancery court is found to be correct in all things, and the same is, therefore, affirmed.

HUMPHREYS, J., disqualified.