SHATFORD *v.* SHATFORD.

4-8667                                                          217 S. W. 2d 917

Opinion delivered January 24, 1949.

Rehearing denied March 21, 1949.

*Wayne Jewell* and *Wilson & Kimpel,* for appellant.

*Mahony & Yocum, Walter L. Brown* and *Silas W. Rogers,* for appellee.

ED. F. McFADDIN, Justice. This case originated as a suit by the man (hereinafter called Shannon) seeking to annul his marriage with the woman (hereinafter called Jean) on the ground of her fraud in obtaining the marriage. The Chancery Court granted the prayed relief, and annulled the marriage; and this appeal challenges that decree. The voluminous record has 680 pages, which include the 18-page opinion of the learned Chancellor. Three questions are presented, which we will discuss under suitable topic headings.

I. *The Cause of Action.* The complaint alleged that Jean represented to Shannon that she was pregnant by reason of their sexual intercourse, and that he was the father of the unborn child; that said representations by Jean as to paternity of her unborn child were "false and fraudulent and were known to her at the time to be false and fraudulent, and that thereby defendant perpetrated a fraud upon the plaintiff"; that Shannon relied on Jean's representations (as to the paternity of the unborn child), since he did not know they were false; that because of such representations the parties were married on January 25, 1947; but that after the marriage Shannon learned of the falsity of the representations as to the paternity of the unborn child. This suit for annulment was instituted on March 4, 1947. The child was born to Jean on September 18, 1947. The chancery decree of annulment was rendered December 15, 1947.

In short, the question is: On the ground of fraud, will a court of equity grant the husband an annulment of the marriage when the wife falsely represented to the husband—in order to obtain the marriage—that he was the cause of her pregnancy because of their ante-nuptial sexual relations, and when the wife knew the truth to be that some other man was the cause of her ante-nuptial pregnancy? Section 9021, Pope's Digest, provides: ". . . where the consent of either party shall have been obtained by . . . fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction." In *Mason* v. *Mason,* 164 Ark. 59, 261 S. W. 40 this language appears: "It has been held that a marriage induced by misrepresentation as to the paternity of a child will afford grounds for annulment, where the parties had been having sexual intercourse before the marriage and the husband was induced to believe, by the false representations, that he was the father of the child. Nelson on Divorce and Separation, §§ 607, 608, 609." While the quoted language was not necessary to the decision in the Mason case, nevertheless, the quotation is a correct statement of the trend of the modern cases. In 35 Am. Juris. 264 this appears: "Later cases have generally granted relief by way of annulment of a

marriage entered into by a man because of the fraudulent representations by a woman that the child with which she is pregnant is his." See, also, annotations, "Right to Annulment of Marriage Induced by False Claim that Husband was Cause of Existing Pregnancy", in 11 A. L. R. 931 and 19 A. L. R. 80.

The earlier decisions held that the husband was not entitled to an annulment in circumstances as here alleged. Most of these cases denying the husband relief were based on either the equitable maxim that "He who comes into equity must come with clean hands", or that "Equity aids the vigilant." Cases based on the first maxim hold that the husband, having practiced antenuptial unchastity with the woman who subsequently became his wife, could not expect equity to aid him in granting an annulment. Cases based on the second maxim hold that the husband should have made diligent inquiry before marrying his wife, since he knew of her ante-nuptial unchastity; and that his subsequent desire for annulment came too late. For cases denying the husband annulment, see: *Foss* v. *Foss,* 12 Allen, [Mass.] 26; *Crehore* v. *Crehore,* 97 Mass. 330, 93 Am. Dec. 98; *Safford* v. *Safford,* 224 Mass. 392, 113 N. E. 181, L. R. A. 1916 F, 526; *States* v. *States,* 37 N. J. Eq. 195; *Seilheimer* v. *Seilheimer,* 40 N. J. Eq. 412, 2 Atl. 376; *Santer* v. *Santer,* 324 P. 140, 188 Atl. 531.

In *Morris* v. *Morris,* 1 Terry, 480 (Del.), 13 Atl. 2d 603, this statement is made in that scholarly opinion: "It is a noteworthy fact that no case, pertinent to the present discussion, denying relief to the husband, has been determined since 1892." The modern cases allow the husband relief in the situation here alleged, and grant him an annulment of the marriage. The reasoning on which most of these cases are based is well stated by the Supreme Court of Wisconsin in *Winner* v. *Winner,* 171 Wis. 413, 177 N. W. 680, 11 A. L. R. 919:

"To say that, under such circumstances, the man has no right to rely upon the woman's statements that he is the father of the child she is bearing, and that he must make inquiry elsewhere as to her chastity, is to

negative all virtue, all truthfulness, and all decency in every woman that may have been imprudent enough to anticipate with her lover the rights of the marriage relation. . . . The act of marriage in such a case is not the result of negligent credulity, but of honorable motives to repair, as far as possible, wrongs inflicted or shared by him. Such conduct should be encouraged, to the end that lesser wrongs be remedied instead of being followed by greater ones.''

Among cases announcing and following the modern rule as stated in *Winner* v. *Winner, supra,* there are the following: *Lyman* v. *Lyman,* 90 Conn. 399, 97 Atl. 312, L. R. A. 1916E, 643; *Wallace* v. *Wallace,* 137 Iowa 37, 114 N. W. 527, 14 L. R. A., N. S. 544, 126 Am. St. Rep. 253, 15 Ann. Cas. 761; *Gard* v. *Gard,* 204 Mich, 255, 169 N. W. 908, 11 A. L. R. 923; *Jackson* v. *Ruby,* 120 Me. 391, 115 Atl. 90, 19 A. L. R. 77. See, also, *Ritayik* v. *Ritayik,* 202 Mo. App. 74, 213 S. W. 883; *Di Lorenzo* v. *Di Lorenzo,* 174 N. Y. 467, 67 N. E. 63, 63 L. R. A. 92, 92 Am. St. Rep. 609; *Short* v. *Short,* 265 Ill. App. 133; *Morris* v. *Morris,* (Del.) 480, 13 Atl. 2d 603; *Yanoff* v. *Yanoff,* 237 Mich. 383, 211 N. W. 735; and *Yager* v. *Yager,* 313 Mich. 300, 21 N. W. 2d 138. Our own case of *Mason* v. *Mason, supra,* is in line with the modern rule. See, also, *Rowell* v. *Rowell,* 184 Ark. 643, 43 S. W. 2d 243. We hold that the complaint in the case at bar stated a cause of action.

II. *The Admissibility of Certain Evidence.* Shannon was permitted to testify that he had no sexual intercourse with Jean prior to January 4, 1947; and witnesses were permitted to testify as to declarations they claimed to have been made to them by Jean:

(a) Some testified that in December, 1946, Jean first said that a man named Wedgeworth was the cause of her pregnancy, and later said that a man named Grace was the cause of her pregnancy.

(b) Some testified that Jean confided to them that she was pregnant several weeks before she ever met Shannon.

It is strenuously insisted by the appellant that all of such evidence was inadmissible, since it tends to

bastardize the child born after she married Shannon; and we are cited to *Kennedy* v. *State,* 117 Ark. 113, 173 S. W. 842, L. R. A. 1916B, 1052, Ann. Cas. 1917A, 1029, wherein we adopted the so-called "Mansfield Rule." We quote from *Kennedy* v. *State*:

"Lord Mansfield, in *Goodright* v. *Moss,* 2 Cowp. 591, declared as follows: 'It is a rule founded in decency, morality and policy that they' (husband and wife) 'shall not be permitted to say, after marriage, that they have had no connection and that therefore the offspring is spurious.'

"The weight of authority in this country at the present time is in favor of the doctrine announced by Lord Mansfield, and it is now generally held that, in the absence of a statute authorizing a married woman to testify as to the fact of nonaccess of her husband, she is incompetent to testify to that single fact in an affiliation or bastardy proceeding. 3 Ruling Case Law, § 11, p. 731; 6 Am. & Eng. Ann. Cas. 816, note.

"In *Tioga County* v. *South Creek Township,* 75 Pa. St. 433, the court said: 'Many reasons have been given for this rule, prominent among them is the idea that the admission of such testimony would be unseemly and scandalous, and this is not so much that it reveals immoral conduct upon the part of the parents, as because of the effect it may have upon the child who is in no fault but who must nevertheless be the chief sufferer thereby. . . . That the parents should be permitted to bastardize the child is a proposition which shocks our sense of right and decency, and hence the rule which forbids it.'" See, also, *Jacobs* v. *Jacobs,* 146 Ark. 45, 225 S. W. 22.

The Mansfield Rule has been severely criticized by Prof. Wigmore in his work on Evidence, Vol. VII, 3rd Ed., § 2063. But this rule is so firmly recognized in this State and in most other jurisdictions that we are unconvinced by Prof. Wigmore's statements. For other cases and notes discussing the Mansfield Rule, see: 60 A. L. R. 380; 68 A. L. R. 421; 89 A. L. R. 911, 13 Er. Rul.

Cas. 312; 3 Jones on Ev. (4th Ed.), § 733, p. 1316; 7 Am.
Juris. 630, § 21. See, also, *Yanoff* v. *Yanoff*, 237 Mich.
383, 211 N. W. 735 and *O'Reily* v. *O'Reily*, 120 Nebr.
720, 234 N. W. 916, where the parties were held incompetent to testify even in an annulment proceeding.

But the present proceeding is neither a proceeding
to establish paternity nor to determine heirship, and
under our statute—§ 9021, Pope's Digest—the annulment, if granted, would make the marriage void only
from the time of the court's determination. The decision
in the present suit cannot be *res judicata* in either a
bastardy or an heirship proceeding. Bastardy proceedings are special statutory proceedings. (See § 928, *et
seq.*, Pope's Digest; and 7 Am. Juris. 679.) The right
of heirship of the child (born after the marriage of
Shannon and Jean) would necessarily be determined in
a case in which the child was a party, and such is not
the situation here. The general rule as to what judgments are *res judicata* is stated in *Mo. Pac. R. Co.* v.
*McGuire*, 205 Ark. 658, 169 S. W. 2d 872: "As stated in
30 Am. Juris. 908: 'Briefly stated, the doctrine of *res
judicata* is that an existing final judgment rendered upon
the merits, without fraud or collusion, by a court of
competent jurisdiction, is conclusive of rights, questions
and facts in issue, *as to the parties and their privies,* in
all other actions in the same or any other judicial tribunal
of concurrent jurisdiction.' " (Last italics supplied).

We hold that the child is not a "party privy" to
this present annulment proceeding. Particularly is it true
that the legitimacy of the child cannot be settled by the
present suit, since § 4342, Pope's Digest, provides: "The
issue of all marriages deemed null in law, . . . shall
be deemed and considered as legitimate."

The general rules as to competency of witnesses,
admissibility of evidence and burden of proof are applicable to this suit, just as they are to any other suit
seeking to annul a contract for fraud. 35 Am. Juris. 231.
Therefore, since the decision in this case is not *res judicata* in any subsequent bastardy proceeding or in any
case involving the heirship of the child born after the

marriage of Jean and Shannon, we hold that the testimony of Shannon and the testimony as to the alleged declarations of Jean are admissible evidence in this annulment suit.

III. *Sufficiency of the Evidence.* The burden of proof was on Shannon, as plaintiff, to establish the alleged fraud by clear and convincing evidence. In 55 C. J. S. 938, in discussing proceedings seeking to annul a marriage, this is stated as the general rule: ''The courts will not grant a decree of nullity except on the production of clear, satisfactory and convincing evidence.'' Indeed, since marriage is a solemn contract, entered into by license from the State, it is clear that the same *quantum* of evidence is required to set aside a marriage contract for fraud as is required to set aside any other written contract. In *Green* v. *Bush,* 203 Ark. 883, 159 S. W. 2d 458, we said: ''This is a suit to cancel a deed upon the grounds that its execution was procured by fraud; which is never presumed, but must be affirmatively proved by testimony which is clear and convincing. *Kincaid* v. *Price,* 82 Ark. 20, 100 S. W. 76; *English* v. *North,* 112 Ark. 489, 166 S. W. 577; *Norsworthy* v. *Hicks,* 170 Ark. 877, 281 S. W. 660.'' The same rule applies in a suit to annul a marriage contract—*i. e.,* the testimony must be clear and convincing. The question now to be considered is whether plaintiff's evidence satisfies that requirement. Since we are reversing the decree of the Chancery Court on the facts, we necessarily discuss the evidence in some detail, even though much of the testimony was indecent.

On January 11, 1947, Jean reported to Shannon that she was pregnant. This fact, standing alone, is conceded. At the same time Jean reported to Shannon that he was the father of the unborn child; and it is claimed that the latter representation was false and known by her to be false. Did Shannon establish the falsity of that representation by evidence that is clear and convincing? The first act of intercourse between the parties—as testified to by Shannon—was on January 4, 1947; and the child was born on September 18, 1947,

which was 257 days after Shannon admitted the act of intercourse to have taken place. Jean did not menstruate at her period about January 8, 1947. Plaintiff's witness, Dr. Wharton, testified that the "usual period of gestation of a child is 270-280 days." Dr. Wharton gave this formula: "We calculate it—nearly everybody calculates it the same—this way: if the previous menstrual period before missing a period was normal, add seven (7) days to the first day of that previous period, and subtract three (3) months, or add nine months. That merely being the law of averages; but it will be within two (2) weeks one way or the other, of that particular date." If we add the variation of "2 weeks one way or the other" to the 257 days, we get 271 days, which is within the proper time according to Dr. Wharton.

Dr. Wharton further testified that if Jean had her regular menstrual period in December, 1946, and became pregnant and missed her January, 1947, period, then according to his formula she would give birth to the child on September 17, 1947. That is exactly the date of the birth of the child. In addition to the testimony of Dr. Wharton, reference was made, in the trial below and in the briefs here, to adjudicated cases and medical texts discussing the period of gestation. Some of these cases and medical authorities are: *In re McNamara's Estate,* 181 Calif. 82, 183 Pac. 552, 7 A. L. R. 313; *Commissioner* v. *Leary,* 144 App. Div. 283, 129 N. Y. S. 148; *State* v. *Sexton,* 10 S. Dak. 127, 72 N. W. 84; *State* v. *Law,* 93 Kan. 357, 144 Pac. 232; *Souchek* v. *Karr,* 78 Nebr. 488, 111 N. W. 150; *Dazey* v. *Dazey,* 50 Calif. App. 2d 15, 122 Pac. 2d 308; Appleton's Medical Series, Obstetrics, 2d Ed., p. 164; 1 Taylor's Principles and Practice of Medical Jurisprudence, p. 196; Rodgers on Domestic Relations, p. 563; and Joseph B. DeLee's Principles and Practice of Obstetrics, Sixth Ed., chap. 5, p. 120.

From the evidence of Dr. Wharton and the medical authorities and adjudicated cases, we reach the conclusion that it is entirely possible—if not almost probable— from a medical viewpoint for the admitted coition between Jean and Shannon on January 4, 1947, to have caused her pregnancy, and for Shannon to be the father

of the child born on September 17, 1947. Certainly the medical testimony failed to present "clear and convincing evidence" to support Shannon's suit for annulment.

We turn then to the other evidence as given by the witnesses, and we refer to this as the "human evidence":

(a) Some witnesses testified that in December, 1946, Jean first said that a man named Wedgeworth was the cause of her pregnancy, and later said that a man named Grace was the cause.

(b) Some witnesses testified that Jean confided to them that she was pregnant several weeks before she ever met Shannon.

Opposed to these witnesses, there were those for appellant, the recounting of whose testimony would serve no useful purpose. Jean denied making any of the statements summarized in (a) and (b), *supra*. While she claimed that the first intercourse with Shannon was in early December, 1946, we regard as most significant the facts: (1) that Shannon admitted he had intercourse with Jean on January 4, 1947, which could have caused pregnancy; and (2) that according to the medical testimony the child, born on September 17, 1947, could have been the result of the coition of January 4, 1947.

There were efforts made to show Jean's past life in order to discredit her testimony; and Shannon's previous marital adventure and fatherhood were matters of proof. Also, Shannon's parentage was questioned by filthy and unsupported innuendo. We hold that the allegations as to one party having venereal disease at the time of the marriage failed of proof. Also, we hold that Jean's past life in respect to sexual immorality was not shown by sufficient evidence to have been affirmatively concealed or misrepresented in a way to justify annulment, when consideration is given to Shannon's conduct, his experience, and his admitted designs from the date of introduction. Shannon admitted that he saw her two living children before he married her. He was a man of full age; the evidence shows that he was born October 8,

1924; that he served in the Armed Forces of the United States from July, 1943, until March, 1946; that he was married to Mary Ann in Texas on November 22, 1944; that they had a child born September 27, 1946; that Mary Ann obtained a divorce in Illinois on or about January 13, 1947; and also obtained the custody of the child of that marriage. Shannon was not an immature youth taken in by an aged adventuress. He was a willing party to this marriage.

The case was tried by each side with an inclination to proceed with "no holds barred." Testimony involved disclosures of revolting conduct engaged in by some of the witnesses, and in one or two instances brazenly admitted. But certain facts stand out: Shannon and Jean continued cohabitation after their marriage, and he wrote her most endearing love letters until he informed his parents of his marriage. In his letter to her of February 6, 1947, he said: "Gee hon I sure miss you. I even kiss your picture every night before I go to bed.

"Well hon till Sat then good night, sleep tight, pleasant dreams and so on. I love you very much."

On February 11, 1947, he wrote her: "My own darling:

"Well I have written the folks about us and am now waiting on the verdict so keep your fingers crossed.

"Honey I love you very much and always will. We will have to stick together you know.

"Well now don't go to any Dr till you hear from me on this letter. I have written the folks. Ok hon."

On February 12, 1947, he wrote her:

"My dear wife:

"Well hon I wrote to the folks and as yet haven't heard an answer. As for annulling the marriage I don't think they can do it.

"I went into Little Rock this afternoon and went to the veterans board and I will have to have the marriage

certifit to get it put on record so I can draw $90 bucks a month so please send it to me.''

On February 15, 1947, he wired her: ''Won't be home over weekend. Have work to do. Letter following. Love. Shannon.'' He never wrote or wired her thereafter. When he told his family of the marriage, investigation was made of Jean's past, and this suit was filed.

The learned Chancellor's opinion was predicated on the assumption that ''the date of the conception of this child, whether by plaintiff or someone else, is admitted to be the 10th or 11th of December, 1946.'' Based on that quoted premise, the Chancellor reached the conclusion that Shannon was not the father of the child, since he met Jean for the first time—by his calculation—on December 23, 1946. But we point out that the date of conception was not agreed to have been December 10th or 11th, 1946, as the learned Chancellor was led to believe. Rather, Jean testified that she menstruated on December 10, 1946, and became pregnant by reason of intercourse with Shannon on January 4, 1947. The Chancellor's finding was based on a premise that was not admitted, but was controverted.

With the evidence as it is in this case, we reach the conclusion that the plaintiff failed to prove his allegations by clear and convincing evidence, as is required in such a case. Some of the human witnesses showed themselves unworthy of credibility, and the medical evidence supports Jean as much as it does Shannon. For two comparatively recent cases in which the annulment was denied because the plaintiff failed to present the required *quantum* of evidence, see: *Mitchell* v. *Lloyd*, 126 Me. 503, 140 Atl. 182; and *Bement* v. *Bement* (Utah), 174 Pac. 2d 996.

It follows therefore that the decree of the chancery court is reversed, and the cause of action for annulment of the marriage is dismissed at the cost of the appellee.

To award maintenance and support for Jean and the child, we remand the case to the Chancery Court. On the question of Jean's attorney's fee in this annulment

624

suit, this court held in *Lee* v. *Lee,* 191 Ark. 163, 83 S. W. 2d 840 that attorney's fee could be recovered in an annulment suit. We therefore render judgment against appellee for $1,000, but collection of this may be by execution and not by contempt.