518 S.W.2d 113 (1974)
O____F____L____, Plaintiff-Respondent,
v.
M____ R____ R____, Defendant-Appellant.
No. KCD 26679.
Missouri Court of Appeals, Kansas City District.
December 30, 1974.
*115 Richard E. Duggan, Kansas City, for defendant-appellant.
Popham, Popham, Conway, Sweeny & Fremont, Thomas J. Conway, Kansas City, for plaintiff-respondent.
Before PRITCHARD, P.J., and SWOFFORD, and SOMERVILLE, JJ.
SOMERVILLE, Judge.
It is impossible to envisage the legal issues presented by this appeal without first being exposed to a mixture of sad and offensive facts and the unprecedented nature of the legal action in which they culminated.
On March 1, 1965, J____ R____(now J____ L____), hereinafter referred to as the mother, who is not a party to this action, gave birth to a male child named T____ R____, hereinafter referred to as the male child, and who, likewise, is not a party to this action. At the time of the male child's birth, the mother was lawfully wed to M____R____R____, hereinafter referred to as the first husband, defendant below, and appellant in this court. The mother and the first husband were married on or about August 7, 1959. Approximately four years prior to the birth of the male child, a female *116 child, whose interests are in no way involved in this litigation, was born of the marriage between the mother and the first husband.
On March 16, 1965, fifteen days after giving birth to the male child the mother filed a divorce action against the first husband, and, in her petition, among other things, alleged that there were two children born of the marriage between herself and her first husband, namely the male child and the female child heretofore referred to. In her divorce petition, the mother prayed for severance of the marriage between herself and her first husband, and so far as pertinent here, that she be awarded custody of the two minor children born of the marriage, and that the first husband be compelled to pay child support. The first husband by way of answer to the divorce petition admitted the allegation contained in the mother's divorce petition regarding the two children born of the marriage. On or about June 1, 1965, the court before whom the divorce petition was pending granted the mother a divorce as prayed for and awarded her custody of the male child and the female child heretofore referred to and ordered the first husband to pay the mother "$25.00 a week for the two children."
On December 4, 1965, the mother married O____F____L____, hereinafter referred to as the second husband, plaintiff below, and respondent in this court.
On April 8, 1972, the second husband brought an action in the Circuit Court of Jackson County, Missouri, against the first husband, captioned, "Petition for Declaratory Judgment", wherein the second husband alleged, (1) that in 1964, while married to another woman, he engaged in sexual intercourse with the mother who was at the time married to and the wife of the first husband, (2) that the male child was born on March 1, 1965, as the result of said adulterous union, (3) that the mother divorced the first husband on June 1, 1965, and subsequently married the second husband, and (4) that since his marriage to the mother he has at all times "stated" that the male child "is his natural son" and he has recognized the male child to be his "natural son". The second husband's petition concluded with a prayer for judgment "declaring that he is the lawful and natural father" of the male child.
In answering the second husband's petition, the first husband admitted that a "male child was born on March 1, 1965", that he "was divorced" from the mother on June 1, 1965, but he stated he "did not have knowledge of sexual intercourse" between the second husband and the mother, and he specifically denied "each and every other allegation" contained in the second husband's petition. The first husband's answer concluded with an affirmative assertion that the second husband's cause of action was barred by "the Doctrine of Laches and Collateral Estoppel". Nowhere in his answer did the first husband affirmatively or positively assert that he was the natural father of the male child. Whether the lack of such an affirmative or positive assertion was the result of mere happenstance or design is relegated to the unknown for all time.
The issues joined by the second husband's petition and the first husband's answer were tried by the court, sitting without a jury, on January 19, 1973. The only evidence adduced was that on behalf of the second husband. It consisted of his sworn testimony and that of the mother and certain exhibits, more about which will be said later. The first husband did not testify, nor did he introduce any evidence whatsoever, either by way of witnesses or exhibits. Necessarily, he must and does rely on the testimony of the second husband and the mother, principally as elicited on cross-examination, to support his allegations of error on appeal.
In addition to certain background evidence already touched upon, the uncontradicted evidence of the second husband and the mother disclosed that they mutually engaged *117 in sexual intercourse "about once a week" starting in February or March of 1964 and continuing through the time the male child was conceived on or about the middle of May, 1964. The mother testified that from October or November of 1963 on she at no time had sexual intercourse with her first husband, nor did she have sexual intercourse with anyone other than the second husband. The mother affirmatively acknowledged that the male child was conceived as the result of her illicit relations with the second husband, and he, likewise, affirmatively acknowledged himself to be the father of the male child. The second husband even acknowledged to the parents of the mother, prior to the time she separated from her first husband, that he, the second husband, sired the expectant child the mother was carrying. The mother and the first husband separated a few days after the male child was born. After the mother obtained a divorce from the first husband, and the second husband obtained a divorce from his wife, the mother and second husband were married, said marriage occurring on December 4, 1965.
The mother has had continuous custody of both the male child and the female child[1] born during her marriage to the first husband since her separation and divorce from the first husband. Both children have resided with the mother and the second husband since the latters' marriage. When the male child became three years of age, the first husband was given visitation rights with the child, which apparently included the right to keep him overnight. Starting approximately a year before the second husband filed the action here on appeal, and continuing up until such time as the action was filed, the male child complained when he returned from visits to the first husband that the first husband would hit him on the head. These complaints prompted the second husband to file the paternity action now before this court.
Since the marriage between the mother and the second husband, the second husband has provided a home for the male child and held the male child out to people in general and to his business associates as his son, and has introduced the male child to them as his son. Five or six years prior to filing the paternity action the second husband named the male child as his heir in a trust he set up and made provision therein for the male child. Ever since the male child started attending school he has used the second husband's last name.
On cross-examination the second husband was questioned about waiting seven years to bring the paternity action. Summarized, his answer was that he was concerned that the mother might lose custody of the female child born of the marriage to the first husband if the true lineage of the male child was made a matter of public record. However, the physical abuse being heaped upon his son by the first husband turned the tide and he, the second husband, "could not take it any more" and he concluded by saying "[i]t cuts your heart out to see somebody else take your son out of the front door every other Saturday, and I I knew I had to make amends for that with the man upstairs, and I have tried to." The second husband thereupon employed counsel and initiated the declaratory judgment action.
On cross-examination, the mother was questioned about the divorce petition she had filed against the first husband. The mother admitted that she had alleged in her petition that there were two children born of the marriage to her first husband. Her explanation for this allegation was that she was concerned for her daughter. She further admitted that when she was awarded a divorce she was granted custody of the two children and awarded child support of "$25.00 a week for the two children". She testified that the $25.00 a week for the two children" came by checks *118 through the mail but she had not cashed any of the checks "for four years" and had offered to return the uncashed checks to the first husband. On redirect examination the mother testified that she had never been "interested" in receiving any money for the male child from the first husband.
Exhibits 1 and 2 heretofore referred to, offered by the second husband, and received in evidence, may collectively be referred to as "blood tests" of the mother, the male child, the first husband and the second husband, with accompanying expert medical opinions that in view of the different blood types possessed by the first husband and the male child, the first husband was scientifically excluded from being the natural father of the male child.
The evidence related above stands uncontradicted. It is also deemed appropriate to mention, for reasons hereinafter disclosed, that not one scintilla of evidence appears in the record that the second husband paid for the mother's divorce from the first husband, or that he was present during any of the proceedings in connection therewith, or that he in anyway actively participated therein.
The trial court made detailed findings of fact and conclusions of law before rendering judgment that the second husband was the natural father of the male child. This court specifically mentions only those findings of fact and conclusions of law deemed pertinent to the issues pending on appeal. Findings of Fact: (1) The male child was the natural biological son of the second husband and the mother, present wife of the second husband; (2) the second husband, upon learning that the first husband was physically abusing the male child, immediately employed counsel to institute an action to establish that he was the natural father of the male child, and that his failure to do so earlier was justified because of his concern that the mother might lose custody of the female child born of her marriage to the first husband; (3) the amount of uncashed child support checks approximated "within a few dollars" the amount the first husband was ordered to pay for the support of the male child. Conclusions of Law: (1) Any presumption that the male child was the son of the first husband by reason of his birth during the first husband's marriage to the mother was "overcome" by the uncontradicted and undisputed evidence; (2) the second husband was not collaterally estopped to bring the declaratory judgment action to establish that he, rather then the first husband, was the natural father of the male child; (3) the second husband was not "guilty of laches" in waiting approximately seven years to bring the declaratory judgment action, and (4) the subsequent marriage of the second husband and the mother after the birth of the male child "makes him their legitimate child".
On appeal the first husband rests his entire case on two points: (1) The second husband's declaratory judgment action constitutes a collateral attack upon an existing judgment [the final judgment entered in the divorce action brought by the mother against the first husband] and, therefore, the second husband is estopped from relitigating the male child's paternity; and (2) the second husband "willfully and deliberately delayed" bringing the declaratory judgment action "and as a result substantially affected the legal rights of [the first husband] and thereby making [the second husband] guilty of laches and barring him from bringing this action."
The precise points on appeal asserted by the first husband, for purposes of disposition, will initially be immured and seriately dealt with.
The thrust of the first husband's initial point appears to be as follows: There was an ancillary determination in the divorce action between the mother and the first husband that the male child was the legitimate son of the first husband and, therefore, the second husband is estopped to relitigate the male child's paternity in the declaratory judgment action. Even though it *119 be assumed, arguendo, that the male child's legitimacy was judicially determined as an ancillary matter in the divorce action, Blackburn v. Crawfords, 3 Wallace's Reports 175, 18 L.Ed. 186 (U.S.1865), cited with approval in Kearney v. Denn, 15 Wallace's Reports 51, 21 L.Ed. 41 (U.S. 1872), holds (apparently applying the law of Maryland) that a judgment and decree affecting legitimacy binds only parties and their privies. See also A___ B___ v. C___ D___, 277 N.E.2d 599 (Ind.App. 1971). This court's research has failed to disclose any Missouri case holding to the contrary. Principles of estoppel are hereinafter discussed in the context of an action other than a pure in rem action.
The authorities cited by the first husband in support of his contention, and the argument made, constitute a total failure on his part to come to grips with any precise legal theory to support his contention. More bluntly stated, it is impossible to discern whether his claim of estoppel rests upon the doctrine of estoppel by judgment, the doctrine of estoppel by verdict, or the doctrine of estoppel by virtual representation. His cited authorities and the argument portion of his brief vividly demonstrate this observation because he uninhibitedly leaps from one to the other with apparent unconcern that there are legally recognized differences between the doctrines and their controlling applicability. In order to put the first husband's first ground of error in proper dispositional context it is necessary to momentarily digress and point out that the various doctrines are legally heterogeneous. The differences between the various doctrines are real, not merely imaginary. Smith v. Preis, 396 S.W.2d 636, 640 (Mo.1965), succinctly distinguishes the difference between estoppel by judgment and estoppel by verdict:
"A former adjudication on the same cause of action between the same parties is conclusive in a second proceeding as to every issue of fact which was or might have been litigated in the first under what is called res judicata or estoppel by judgment [,] Abeles v. Wurdack, Mo., 285 S.W.2d 544, 546 [,]... [h]owever, a judgment between the same parties on a different cause of action is binding as to the facts actually decided, and necessarily determined in rendering the judgment under what is called estoppel by verdict ... Abeles v. Wurdack, supra." (Emphasis added.)
See also Schmitt v. Pierce, 379 S.W.2d 548 (Mo.1964), and State ex rel. Gott v. Fidelity & Deposit Co. of Baltimore, Md., 317 Mo. 1078, 298 S.W. 83, 87 (Mo. 1927).
Since the prior divorce action and the present declaratory judgment action to determine the male child's paternity are obviously different causes of action the doctrine of estoppel by judgment is clearly inapplicable and can not be relied on by the first husband to preclude the second husband from litigating the male child's paternity by the declaratory judgment action. This leaves the question of whether the doctrine of estoppel by verdict is applicable, thereby precluding the second husband from litigating the male child's paternity by the declaratory judgment action. It is axiomatic that both estoppel by judgment and estoppel by verdict, if applicable to subsequent proceedings, bind not only parties to the original cause of action or original facts actually litigated and determined, but, likewise, bind parties in subsequent proceedings who are in privity with a party to the original action. This poses the apical question of whether the second husband was in privity with the mother regarding the divorce action. Bear in mind, any interest in the male child possessed by the second husband came into being prior to the commencement of the divorce action by the mother against the first husband, because the male child at that time was two weeks old. Pertinent to the chronological fact just mentioned, the court in Mathison v. Public Water Supply District No. 2, 401 S.W.2d 424, 431 (Mo.1966), stated that "to make one `privy' to an [earlier] action he must have acquired his interest *120 in the subject matter of the action subsequent to the commencement of the suit or rendition of judgment." [Citing: 50 C.J.S. Judgments § 788, p. 324; Womach v. City of St. Joseph, 201 Mo. 467, 100 S.W. 443, 445-446, 10 L.R.A.,N.S., 140; and National Lead Co. v. Nulsen, 8 Cir., 131 F.2d 51, 56[7]].
Likewise pertinent to the chronological fact above mentioned, the court in Hocken v. Allstate Ins. Co., 235 Mo.App. 991, 147 S.W.2d 182, 186 (1941), held:
"We do not believe that the plaintiff in this case was privy to the judgment for the reason that she acquired whatever right she possessed under the policy prior to the institution of the equity suit. After those rights came into existence, the insured could not by any act, or by the submission to the rendition of judgment against him, lessen the interest vested in plaintiff. The rule applicable here is stated in 2 Black on Judgments, Sec. 549, as follows: `... privies, in such sense that they are bound by the judgment, are those who acquire an interest in the subject matter after the rendition of the judgment; if their title or interest attached before that fact, they are not bound unless made parties.'"
Under the prevailing and controlling law of this state, the second husband was not in privity with the mother so far as the divorce action was concerned and, perforce, was not barred by the doctrine of estoppel by verdict to institute and prosecute to a final conclusion the declaratory judgment action to establish the true paternity of the male child. This pivotal point is concluded adverse to the first husband by noting, parenthetically, that social privity does not rise to the dignity of legal privity.
The doctrines of estoppel by judgment and estoppel by verdict have been eliminated as supportive of the first husband's initial ground for appellate relief, thus leaving only the doctrine of virtual representation for analysis and determination of whether or not it has controlling applicability in this case. The doctrine of virtual representation, although apparently recognized as the theoretical justification for class actions, is founded in equity and, unlike class actions, does not depend upon a statute or rule; nor is its application and operation in all respects identical to that of class actions. See Brown v. Bibb, 356 Mo. 148, 201 S.W.2d 370 (1947). The foundational theory of the doctrine of virtual representation appears to be that when a number of persons have a community of interest in the same side of a litigated matter, and the interest of each is in common with every other interest, the natural instinct for self-preservation will cause one with a common interest who is a party to the litigation to protect his own interest, and, by doing so, he will, necessarily, protect the common interests of those who are not parties. As expressed in 46 Am.Jur.2d, Judgments, Sec. 539, p. 695: "Under the so-called doctrine of class or virtual representation, one or more persons may be permitted to maintain or defend an action for themselves and various other persons similarly situated and interested, and an exception to the general rule that no persons are bound by a judgment except those who are parties or stand in privity with others who are parties exists in the case of persons who are so represented by persons on the record as parties." Thus, privity, in the classic legal sense employed with reference to operation of the doctrines of estoppel by judgment and estoppel by verdict, is not a prerequisite for application of the doctrine of virtual representation. This court has serious reservations whether the doctrine of virtual representation does or was ever intended to have application where the represented and the representative, as here, are one on one. It is not necessary to resolve this legal conundrum because there are inherent safeguards in the doctrine itself which otherwise make it inapplicable in this case. These safeguards are objectively expressed in Drainage District No. 1 *121 Reformed v. Matthews, 234 S.W.2d 567, 574 (Mo. 1950):
"The doctrine of virtual representation, well recognized in equity, is based upon considerations of necessity and paramount convenience and may be invoked to prevent a failure of justice. Brown v. Bibb, 356 Mo. 148, 201 S.W.2d 370, 374. The doctrine is applicable if. . . the interest of the represented and the representative are so identical that the inducement and desire to protect the common interest may be assumed to be the same in each and if there can be no adversity of interest between them." (Emphasis added.)
As earlier pointed out, the record in this case is bare of even a modicum of evidence that the second husband knew, either before or at the time the divorce action was reduced to a final judgment, that the mother had alleged in the divorce petition filed against the first husband that the male child was born of the marriage sought to be ended. This court is unwilling to engage in rampant speculation that such fact was known by the second husband prior to or at the time the divorce judgment was rendered and became final. Therefore, an inescapable positive fact emerges that precludes the doctrine of virtual representation, even if otherwise applicable, from barring the second husband's declaratory judgment action in view of the safeguards laid down in Drainage District No. 1 Reformed v. Matthews, suprathe mother in the divorce action had no motivating desire to protect the second husband's interest in establishing the male child's true lineage, and her interest with respect thereto was obviously adverse to that of the second husband, who, by clear, cogent and convincing proof, was the biological father of the male child, a fact well known to the mother at the time.
The unprecedented nature of this paternity action, biological father pitted against presumptive father, as might well be expected, has literally defied the expeditious location of any case authority directly in point on the issue of estoppel. Neither of the parties to this appeal have favored the court with such authority. The court's own exhaustive research disclosed but two cases that could be considered directly in point, State ex rel. Bentley v. Frenger, 158 Wash. 683, 291 P. 1089 (1930) and A___ B___ v. C___ D___, 277 N.E.2d 599 (Ind.App.1971). Bentley involved a habeas corpus proceeding. Bentley, claiming to be the father, sought custody of a male child who was in the custody of Frenger. Frenger was married to the male child's mother at the time of its birth. This marriage took place in the state of Washington. Paradoxically, the mother, prior to the child's birth and subsequent to her marriage to Frenger, and while still married to him, entered into a licensed marriage with Bentley in the State of Idaho. The mother, at intervals, with apparent convenience, lived with both "husbands", Frenger and Bentley. After the child was born the mother obtained a divorce [annulment?] from Bentley in the District Court of Idaho. In the Idaho divorce action, the mother was awarded custody of the male child who subsequently became the subject of the habeas corpus proceeding. After the Idaho divorce action the male child remained in the custody of Frenger and the mother. The mother died prior to the institution of the Washington habeas corpus proceeding brought by Bentley. The paternity of the male child was the central issue in the habeas corpus proceeding. The Supreme Court of Washington determined that Frenger was the biological father of the male child and quashed its preliminary writ of habeas corpus from which Bentley appealed. On appeal, Bentley, among other things, contended that the divorce decree rendered by the Idaho court constituted an adjudication that he was the father of the male child which was "binding upon Frenger". The Supreme Court of Washington rejected this contention and affirmed the judgment of the lower court. In doing so, the court, 291 P. l. c. 1091, held: "We think it cannot be said that he *122 was bound by an adjudication of the court rendered therein touching the question of his parentage of the child. Indeed, the divorce decree merely assumes, rather than decides as a controverted question, that the child is the child of Bentley and Mrs. Frenger, naming her as Mrs. Bentley. There is nothing in this record indicating that, upon Frenger's furnishing Mrs. Frenger money to aid her in instituting legal proceedings looking to freeing herself from Bentley, he had the slightest thought that his parentage of the child would be drawn in question or adjudicated in such proceeding. We conclude that that divorce decree does not adjudicate the parentage of the child in the sense that such adjudication would be binding upon Frenger." A___ B___ v. C___ D___, supra, involved a declaratory judgment action. A___ B___ will be referred to as the second husband. C___ D___ will be referred to as the first husband. The second husband's present wife, while married to the first husband, gave birth to a son. After birth of the son, the wife divorced the first husband and married the second husband. In the divorce action instituted and concluded to a final judgment against the first husband, the wife alleged that the son was born as the issue of her marriage to the first husband. The judgment and decree rendered in the divorce action awarded the custody of the son to the wife and ordered the first husband to pay child support. The second husband, during his marriage to the former wife of the first husband, brought a declaratory judgment action against the first husband seeking to be declared the biological and "legitimate" father of the son. The first husband contended the judgment and decree entered in the divorce action estopped the second husband from relitigating the son's paternity in the declaratory judgment action. The Appellate Court of Indiana, Division No. 2, in disposing of this contention adversely to the first husband, stated: "Even though we might be persuaded to agree that by marrying a person known to have been previously married and now purportedly divorced, one is estopped to question the marital status decreed by the purported divorce (which we do not concede), we cannot accept the thesis that he also estops himself to question the paternity implications of a support and custody order made incidental to the divorce decree. Such an order does not affect the child's status, especially when the child is not a party to the action. In fact, the want of any binding effect on the child's status seems to be the basic reason for the widespread practice of not appointing a guardian ad litem for him, or otherwise providing for his representation in divorce cases and paternity-support cases. The finding that the child `was born as the issue of this marriage' amounts to no more than a finding that he was born to the wife during the marriage, a fact not in dispute in the instant case, nor in the divorce case, so far as the record here reveals." This court concludes that paternal parentage of the male child in question was not adjudicated in the earlier divorce action in the sense that such adjudication was binding upon the second husband, and, for reasons heretofore stated, the second husband was not barred by any theory of estoppel from litigating the male child's paternity in the declaratory judgment action.
Attention now focuses on the first husband's second and final ground for appellate reliefthat the second husband was guilty of laches and thereby barred from bringing the declaratory judgment action. The first husband bootstraps his final point by arguing, absent citation of supporting authority, that the second husband's delay in bringing the filiation action "precluded the possibility of criminal prosecution" of the mother "for perjured testimony given in the 1965 divorce action", "precluded the possibility of criminal prosecution" of the second husband and the mother "for adultery", and "further precluded the possibility of civil action" by the first husband against the second husband "for alienating the affections" of the mother. Additionally, and in the order herein set forth, the first husband argues *123 that he was "harmed" by virtue of making support payments for a "child he thought to be his son".
The doctrine of laches finds clarity of expression in Keiser v. Wiedmer, 283 S.W.2d 914, 917 (Mo.App.1955):
"In a general sense laches is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. 30 C.J.S., Equity, § 112, p. 520. However, there is no fixed period of time within which a person must assert his claim or be barred by laches; the length of time depends upon the circumstances of the particular case. 30 C.J.S., Equity, § 116, p. 531. And by the weight of authority, mere delay in asserting a right does not of itself constitute laches. It must be delay that works to the disadvantage and prejudice of the defendant. 30 C.J.S., Equity, § 116, pp. 531-534. This rule has been followed by the courts of this state. [Citing cases.]
Anderson, in his treatise on Declaratory Judgments, Volume 1, Section 344, page 794, says:
"Mere delay, in the absence of prejudice, resulting to someone is generally insufficient to be alleged as a basis for applying the rule of laches, in denying the relief. In other words, laches is not mere delay, but delay that works disadvantage or injury to an adversary, may be sufficient to constitute laches.'" (Emphasis added.)
Did the second husband's delay in instituting the filiation proceeding work to the "disadvantage and prejudice" of the first husband? The matters leveled by the second husband as working to his "disadvantage and prejudice" require separate treatment. Preclusion of criminal prosecution of the mother for "perjury" and preclusion of criminal prosecution of the mother and second husband for "adultery" cannot be said to have worked to the "disadvantage and prejudice" of the first husband. If any disadvantage or prejudice was worked, it was to the citizenry of this state at large, the State of Missouri, not to the first husband individually.
It is impossible, in view of the record, for this court to conceive that the first husband was naively unaware of the adulterous relationship that had existed between the mother and the second husband for a protracted period of time prior to the male child's birth, or that the male child was not sired by him. The uncontradicted testimony of the mother disclosed that the last time she engaged in sexual intercourse with her first husband was some sixteen months prior to the male child's birth. The uncontradicted testimony of the mother further disclosed that prior to her divorce from her first husband he asked her on several occasions if she had been seeing the second husband and she further testified, "he [the first husband] reported to me one time he had a telephone call telling him I was seeing him [the second husband]". The first husband's argument that the second husband's delay in bringing the declaratory judgment action worked to his "disadvantage and prejudice" in not being able to timely file and prosecute an alienation of affections suit simply fails to wash with the uncontradicted evidence standing in the record. The record is replete with evidence of massive proportions from which the trial court could and obviously did find that the first husband knew that the mother was having an affair with the second husband and that the male child was sired by the second husband.
The first husband's final argument, that the delay worked to his prejudice because he was paying child support for a child he had not sired, is equally unpersuasive. The record supports the finding of the trial court that the mother did not cash child support checks in an amount equal to that portion representing child support for the male child, as opposed to child support *124 for the female child born of the first marriage. The able trial judge further insulated the matter of the child support payments from in anyway inuring to the harm or prejudice of the first husband by specifically ordering, in the final judgment entered, that the first husband be relieved from any duty to pay child support for the male child and that an accounting be immediately made between the first husband and the second husband and that the second husband be and was required to reimburse the first husband for child support payments, if any, made by the first husband for support of the male child. Said accounting was ordered to be filed in the trial court and made a part of the record in this case. The first husband makes no contention on appeal that the unorthodox accounting provision contained in the original judgment has not been fully complied with or that he has not been reimbursed in full for child support payments, if any, previously paid for the male child.
The first husband's final point, that the second husband is barred by the doctrine of laches from bringing the declaratory judgment action, is not well taken. This conclusion should not be construed as intimating that this court has treated lightly the serious nature of the self confessed adulterous conduct of the mother and the second husband. To the contrary, this court is acutely aware that the delay in bringing this filiation proceeding may have precluded possible criminal prosecution. But each case must be decided on its own merits as and when presented for judicial review. The record in this case, coupled with the technical points asserted by the first husband on appeal, casts the suspicion, the truth or untruth of which remains undetermined, that the first husband's principle desire throughout has been to heap revenge on the mother and the second husbandnone of which serve the welfare and best interests of the male child around whom this unfortunate controversy swirls. On the other hand, the obvious hedonistic attitude of the second husband prior to and at the time the male child was conceived leaves much to be desired. His contrition thereafter is his most redeeming ally. Nevertheless, by weight of comparison, it appears that genuine paternal affection in this case lies in the bosom of the second husband, not the first husband.
Unfortunately, disposition of the points raised by the first husband on appeal, even though found to be without merit, does not lay this case, which is without precedent in this state, to final judicial rest. Ever since submission and argument of this case on appeal, this court has been unable to shake a gnawing concern regarding certain legal ramifications that appear to be patently involved in any affirmance of the judgment and decree rendered by the trial court. Were the male child and the mother required to be joined as parties under Rule 52.04, V.A.M.R. (effective December 1, 1972, a date preceeding the trial of this case), and, tangentially, would any final judgment and decree, absent the presence of both as parties, whether required to be joined or not, possess any legal efficacy? The question of parties and legal efficacy aside, would a final judgment and decree favorable to the second husband bastardize the male child? This court has concluded that a failure on its part to confront the questions just posed would constitute an abdication of judicial responsibility, even though such questions were not raised or put in issue by any of the parties. These vexing questions will be answered in inverse order.
Assuming, arguendo, that all parties required under Rule 52.04, supra, were properly joined, would a final judgment and decree rendered in favor of the second husband bastardize the male child, whose paternity is being litigated, by virtue of the ageless presumption that a child born in wedlock is presumed to be the legitimate child of the parties joined in wedlock? Patently authoritative case law exists in this state that such a judgment and decree would not bastardize the male child, *125 but would legally constitute the male child as the natural and legitimate child of the mother and the second husband by virtue of Section 474.070, RSMo 1969, V.A.M.S. The ageless presumption of legitimacy, at common law, was conclusive and therefore a rule of substantive law. Today, however, it is but an evidentiary presumption which may be rebutted by clear, cogent and convincing proof. In re L___, 499 S.W. 2d 490 (Mo. banc 1973). There is no question but that the uncontradicted evidence in the instant case not only rose to, but exceeded, the demanding evidentiary height of clear, cogent and convincing proof that the male child was sired by the second husband and not the first husband. The uncontradicted evidence also conclusively established that the mother of the male child and the second husband, sire of the male child, were legally joined in wedlock following the male child's birth and that the second husband recognized the male child to be his own. The aforementioned facts, coupled with Section 474.070, supra, would legitimize the male child as the son of the mother and the second husband. This conclusion finds ample support in Simpson v. Blackburn, 414 S.W.2d 795, 797 (Mo.App. 1967): "To establish this claimed status, plaintiff relies on § 474.070 V.A.M.S. It declares that if a man has a child by a woman whom he afterward marries and recognizes the child to be his, the child is thereby legitimated. This statute applies not only to a child born out of wedlock, but also to a child, like plaintiff, born in wedlock but sired by a man who was not his mother's husband. Nevins v. Gilliland, 290 Mo. 293, 234 S.W. 818[4]. The three essential elements of such legitimation are actual paternity, intermarriage and recognition. Lowtrip v. Green, 363 Mo. 619, 252 S.W.2d 524[1]."
Attention now focuses on the first, and most difficult, of the two questions raised sua sponte by this court. Were the mother and male child required to be joined as parties under Rule 52.04, supra, and, tangentially, would any final judgment and decree, absent the presence of both as parties, whether required to be joined or not, possess any legal efficacy? Although finding no Missouri case directly in point, the weight of authority supports the view that a child is not bound by a finding of nonpaternity in a divorce or annulment action to which he was not a party. Shatford v. Shatford, 214 Ark. 612, 217 S.W.2d 917 (1949); Daniels v. Daniels, 143 Cal.App.2d 430, 300 P.2d 335 (1956); Gonzales v. Pacific Greyhound Lines, 34 Cal.2d 749, 214 P.2d 809 (1950); and State ex rel. Evertson v. Cornett, 391 P.2d 277 (Okl.1964). Even though a child is not required to be a party in a divorce proceeding in this state where his paternity is in issue, State ex rel. Shoemaker v. Hall, 257 S.W. 1047 (Mo. banc 1923), this court, as above pointed out, has found no Missouri case holding that a child is bound by a finding of nonpaternity in any type of action to which he was not a party. More directly in point, a child is not bound by a judgment and decree rendered in a declaratory judgment action, to which he was not a party, declaring him to be the natural and biological son of his putative father rather than his presumptive father. Roe v. Roe, 49 Misc.2d 1070, 269 N.Y.S.2d 40 (1970); and A___ B___ v. C___ D___, supra. The latter case further held that the presence of the child's mother as a party was required in view of her obvious financial interest in support liability. The authorities just cited are deemed by this court to be sound and just, and that the general principle enunciated therein, that a child is not bound by a judgment that his presumptive father is not his biological father in any type of action to which he was not a party, should be followed. Basic logic compels a natural and obvious extension of this principlelikewise a child is not bound by a judgment that he is the biological son of a putative father, rather than the biological son of his presumptive father, in any type of action to which he is not a party. Having determined that the judgment and decree rendered by the trial court herein, even though affirmed on appeal, *126 would not be binding on the male child, absent his presence as a party, it appears patently obvious that whatever else the instant declaratory judgment action may or may not be, it is not an in rem action whereby the male child's legal status may be finally and conclusively adjudicated. The male child is not a chattel, "title" to which may be litigated solely between the first and second husband as rival claimants. See A___ B___ v. C___ D___, supra.
Subdivision (a) of Rule 52.04, supra, and Rule 52.06, both effective December 1, 1972, a date prior to the trial of this action on January 13, 1973, and therefore applicable to and governing it by virtue of Rule 41.06,[1] effective September 1, 1972 (particularly since it appears beyond question that to apply Subdivision (a) of Rule 52.04, supra, and Rule 52.06, supra, would be "feasible" and would not work an "injustice"), directly bear on the question of whether the mother and male child were required to be joined as parties to this action:
"52.04 Joinder of Persons Needed for Just Adjudication
(a) Persons to be Joined if Feasible. A person shall be joined in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason, of his claimed interest. If he has not been joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant." (Emphasis added.)
"52.06 Misjoinder and Nonjoinder of Parties
Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately." (Emphasis added.)
Rule 52.04(a), supra, and Rule 52.06, supra, substantively, are the same, respectively, as Fed.Civ.Rules 19(a) and 21. These new rules, and their federal counterparts, without engaging in a prolix dissertation, were adopted to put an end to the virtually impossible task of judicially determining whether a person was an indispensable party under the old compulsory joinder rules. The new rules emphasize substance rather than broad, loose doctrinaire statements.
In the absence of the mother and the child as parties to this action, can "complete relief . . . be accorded" the second husband and the first husband in this litigation? This court concludes that "complete relief" cannot "be accorded" to them. At this point the rule of mutuality inherent in the doctrine of res judicata also appears to have some collateral significance. The Restatement expresses the rule of mutuality by language to the effect that a person who is not a party or privy to a party to an action in which a valid judgment other than a judgment in rem is rendered, is not bound by or entitled to claim the benefits of an adjudication upon any matter decided in the action. Restatement of Judgments § 93. The rule of mutuality inherent in the doctrine of res judicata *127 has been even more succinctly stated by the Supreme Court of Missouri. "If the judgment is not binding on both it binds neither." Agnew v. Union Construction Company, 291 S.W.2d 106, 109 (Mo. 1956). See also: Bell v. Hoagland, 15 Mo. 254 (1852); Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626 (1942); and McIntosh v. Wiggins, 354 Mo. 747, 191 S.W.2d 637 (1946). Under the rule of mutuality, it would appear that the male child would not conclusively be determined to be the second husband's heir.
It is impossible to perceive how any final judgment in this cause, absent the presence of the mother and the male child as parties, could afford "complete relief" to the first and second husband. The mother's right in the future to seek support for the male child from either husband at her option would not appear to be conclusively barred. The second husband would not conclusively be determined to be the male child's heir. The male child would not be barred at some future date from seeking to establish himself as the first husband's heir. One could go on, literally ad infinitum, listing potential legal questions of serious and practical import, that would be left open-ended and unadjudicated in a final and binding sense by any judgment rendered herein absent the mother and male child being joined as parties. What has been said demonstrates that "complete relief" cannot be afforded either the first or second husband without the mother and male child being joined as parties. Additionally, the first husband, and his estate should he die intestate, could be exposed to a "substantial risk" of being subjected to "otherwise inconsistent obligations" should the male child or his mother seek to impose an obligation on him to support the male child, or in the event the male child on the death of the first husband sought to establish himself as an heir of the first husband.
The vital, crucial and inextricably involved rights of the male child in this unprecedented litigation have been of paramount concern to this court throughout. The very institution of this litigation has opened a festering sore that cannot easily be healed or made benign. But if it is to proceed, the mother and male child are required to be made parties under and in accordance with Rule 52.04(a), with all appropriate safeguards afforded the male child as provided by law and the Rules of Civil Procedure of this state. The mother and male child are both members of the second husband's household. No problem is presented as to the feasibility of joining them as parties. Without them any final judgment in this action would appear to be a classic example of an exercise in legal futility. Without them what would the litigation accomplish other than to provide a forum for the first husband and the second husband to "air" their respective "feelings" concerning the male child's paternity?
Rule 52.06, supra, provides that parties may be added on motion of any party or by the court on its own initiative "at any state of the action and on such terms as are just". The Indiana Court of Appeals, under rules substantively identical to Rules 52.04(a), supra, and 52.06, supra, in A___ B___ v. C___ D___, supra, reversed a summary judgment rendered in favor of defendant, who was the presumptive father of a male child whose paternity was in issue, in a declaratory judgment action brought by a putative father seeking to be declared the biological father of the male child. The Indiana Court of Appeals further remanded the case to the trial court for a new trial after the entry of appropriate orders joining the male child and his mother as parties. In Boles v. Greenville Housing Authority, 468 F.2d 476 (6th Cir. 1972), the United States Circuit Court of Appeals, sua sponte, determined that the Department of Housing and Urban Development (HUD) had such an essential interest in the litigation that it should have been joined as a party in view of Fed.Civ.Rule 19, the federal counterpart of Rule 52.04(a), supra. The United States Circuit Court of Appeals dismissed the appeal and remanded the case to the trial court with *128 directions to set aside a judgment of dismissal entered by the trial court provided the plaintiffs, within a reasonable time (to be determined by the trial court), elected to move to have the proper representatives of HUD joined as parties. See also McShan v. Sherrill, 283 F.2d 462 (9th Cir. 1960), for the proposition that an appellate court, on appeal, may remand a cause for a new trial where there was an apparent failure to join an "indispensable" party, provided the plaintiff chose to proceed further by joining the "indispensable" party. Because of the obvious legal infirmities permeating this litigation by failure to join the mother and male child as parties, and the festering sore that institution of the litigation has already opened, and in view of the unusual facts and unprecedented nature of the litigation presented, this court interprets Rule 52.06, viz "[p]arties may be. . . added by . . . the court. . . of its own initiative at any stage of the action and on such terms as are just", as authoritative support for it to set aside the judgment and decree entered by the trial court and to remand the case to the trial court for a new trial provided the second husband elects to take appropriate steps to have the mother and male child properly joined as parties and to proceed further with the action. This court unhesitatingly reposes full confidence in the able trial judge to see that the male child is afforded proper representation as required by law and the Rules of Civil Procedure of this state, and that the male child also be enveloped with all proper safeguards to insure full and complete protection of his profound, far reaching and vital interests. In this connection a caveat is raised as to whether the mother, or either of the present parties, should represent the child and his interests at any new trial, should the second husband elect to proceed, in view of far more than imaginary possibilities of patent and latent conflicts of interest. The judgment and decree rendered by the trial court is set aside and the cause is remanded to the trial court for a new trial provided the second husband elects to take appropriate steps to have the mother and male child joined as parties and to proceed further with this action. Any negative disposition of this case would defile reality and serve only to fan a burning controversy that should be extinguished.
Judgment set aside and cause remanded for further proceedings at the trial level consistent with the opinion herein.
All concur.
NOTES
[1] The first husband's parentage of the female child is not in dispute or in issue.
[1] "41.06 RulesApplication to Pending Actions

Rules 41 to 101, inclusive, shall govern all proceedings in actions brought after their effective date, and also all further proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action pending when the Rules take effect would not be feasible or would work injustice, in which event the former procedure applies."